**Jonathan Bruce REED, Petitioner,**

v.

**Janie COCKRELL, Director, Texas Department of Criminal Justice Institutional Division, Respondent.**

**No. 3:99–CV–0207–R.**

United States District Court,
N.D. Texas,
Dallas Division.

Feb. 19, 2003.

J Richard Broughton, Attorney General of Texas Capital Litigation Division, Austin, TX, for Janie Cockrell.

*ORDER ADOPTING FINDINGS, CONCLUSIONS AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE*

BUCHMEYER, District Judge.

After making an independent review of the pleadings, files and records in this case, and the findings, conclusions and recommendation of the United States Magistrate Judge, the Court finds that the findings and conclusions of the Magistrate Judge are correct and they are adopted as the findings and conclusions of the Court. Petitioner's objections to the findings and conclusions of the Magistrate Judge are overruled.

### *FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE*

Pursuant to the provisions of 28 U.S.C. § 636(b) and an Order of the United States District Court for the Northern District of Texas, this case has been referred to the United States Magistrate Judge. The findings, conclusions and recommendation of the Magistrate Judge are as follows:

### *FINDINGS AND CONCLUSIONS*

### I. NATURE OF THE CASE

A state prison inmate has filed a petition for writ of habeas corpus pursuant to Title 28, United States Code, Section 2254.

### II. PARTIES

Petitioner, Jonathan Bruce Reed, is an inmate in the custody of the Texas Department of Criminal Justice, Institutional Division (TDCJ–ID). Respondent, Janie Cockrell, is the Director of TDCJ–ID.

### III. PROCEDURAL HISTORY

A jury convicted Petitioner of capital murder, and his punishment was assessed at death by lethal injection. *State v. Reed,* Cause No. F81–1988–PL (Crim. Dist. Ct. No. 5, Dallas County, Tex. Mar. 24, 1983). It was the second time that Petitioner had been tried, convicted, and sentenced to death for such offense.[1] The case was appealed to the Texas Court of Criminal

---

1. Petitioner was originally convicted and sentenced to death in 1979, after his first jury trial. *State v. Reed,* Cause No. F.2D–1447–PL (Crim. Dist. Ct. No. 5, Dallas County, Tex. Mar. 27, 1979). On January 14, 1980, Petitioner filed a motion in state district court for leave to file an out-of-time motion for new trial based upon the newly discovered evidence of the murder of Cheery Sue Belling on August 13, 1979, which Petitioner claimed was sufficiently similar to constitute newly discovered evidence of innocence (as he also now claims in this Court), which was denied on February 27, 1980. (Trial Transcript, hereinafter "R.", p. 284.) However, State

Appeals, and the Court of Criminal Appeals affirmed the conviction and death sentence in an unpublished opinion. *Reed v. State*, No. 69,292 (Tex.Crim.App. Mar. 29, 1995). Petitioner filed a petition for writ of certiorari to the Supreme Court, which was denied on January 8, 1996. *Reed v. Texas*, 516 U.S. 1050, 116 S.Ct. 715, 133 L.Ed.2d 669, *rehearing denied*, 516 U.S. 1142, 116 S.Ct. 977, 133 L.Ed.2d 896 (1996). Petitioner subsequently filed a state application for writ of habeas corpus on October 14, 1996. (State Habeas Record, hereinafter "SHR", pp. 1–134.) The trial court entered findings of fact and conclusions of law and recommended that relief be denied on June 26, 1998. *Ex parte Reed*, No. W81–01988–PL(a) (Crim. Dist. Ct. No. 5, Dallas County, Tex.); (SHR, pp. 644–727.) The Court of Criminal Appeals adopted those findings of fact and conclusions of law and denied relief in a written order on September 16, 1998. *Ex parte Reed*, No. 38,174–01 (Tex.Crim. App.). The Supreme Court denied the petition for writ of certiorari on March 22, 1999. *Reed v. Texas*, 526 U.S. 1021, 119 S.Ct. 1259, 143 L.Ed.2d 355 (1999).

Petitioner filed his original federal petition for writ of habeas corpus on March 23, 1999, and his amended petition for writ of habeas corpus on May 4, 1999. Respondent filed an answer and motion for summary judgment on October 18, 1999, and

furnished the state court records. Petitioner filed a response to this answer on December 22, 1999.

## IV. RULE 5 STATEMENT

In her answer, Respondent states that Petitioner has exhausted all of his state court remedies pursuant to 28 U.S.C. § 2254(b), (c), except for a portion of Petitioner's evidentiary support for his first claim and a portion of Petitioner's argument for his seventh claim.

## V. ISSUES

In thirteen grounds for relief, Petitioner complains of (a) perjured testimony of William McLean,[2] (b) racially discriminatory use of peremptory challenges,[3] (c) the use of a general verdict form of jury instructions,[4] (d) the trial court's denial of a circumstantial evidence charge,[5] (e) the state appellate court's refusal to apply intervening state decision,[6] (f) an inordinate delay in the state appellate process,[7] and (g) the trial court's refusal to instruct on lesser included offense.[8] Petitioner also contends that he is entitled to discovery and an evidentiary hearing.

## VI. STANDARD OF REVIEW
### Applicable Law

The petition for a federal writ of habeas corpus was filed after April 24, 1996.[9]

---

District Judge James K. Alley later granted the Petitioner a new trial in 1980, which resulted in the retrial and subsequent conviction and death sentence at issue in this cause. *State v. Reed*, Cause No. F.2D–1447–PL (Crim. Dist. Ct. No. 5, Dallas County, Tex. Nov. 21, 1980); R., p. 308.

**2.** Petitioner's first claim for relief. (Ample., p. 17–25.)

**3.** Petitioner's second through seventh claims for relief. (Am. Pet., p. 25–56.)

**4.** Petitioner's eighth claim for relief. (Ample., p. 56–62.)

**5.** Petitioner's ninth claim for relief. (Ample., p. 62–66.)

**6.** Petitioner's tenth claim for relief. (Ample., p. 66–71.)

**7.** Petitioner's eleventh and twelfth claims for relief. (Ample., p. 71–105.)

**8.** Petitioner's thirteenth claim for relief. (Ample., p. 105–111.)

**9.** The effective date of the AEDPA.

Therefore, this proceeding is governed by the terms of the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA"), 28 U.S.C. § 2254. *See Lindh v. Murphy,* 521 U.S. 320, 326, 117 S.Ct. 2059, 2063, 138 L.Ed.2d 481 (1997); *Nobles v. Johnson,* 127 F.3d 409, 413 (5th Cir.1997). This statute significantly affects federal habeas-corpus proceedings, particularly in the deference that must be accorded state-court findings.

### Deference Scheme

The AEDPA provides the following deference scheme for review of state determinations of claims that were adjudicated on the merits in state court:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The Supreme Court has explained that the "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meaning.

A state court decision will be "contrary to" our clearly established precedent if the state court either "applies a rule that contradicts the governing law set forth in our cases," or "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." ... A state court decision will be an "unreasonable application of" our clearly established precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case."

(citations omitted) *Penry v. Johnson,* 532 U.S. 782, 792, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001)(hereinafter also *"Penry II "*)(quoting *[Terry] Williams v. Taylor,* 529 U.S. 362, 405-08, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). Under the "unreasonable application" analysis, it is not enough that the state court incorrectly applied federal law. To be entitled to relief, Petitioner must show that the "ultimate legal conclusion" reached by the state court was objectively unreasonable. *Neal v. Puckett,* 286 F.3d 230, 245-46 (5th Cir. 2002); *See also Bell v. Cone,* 535 U.S. 685, 122 S.Ct. 1843, 1850, 1852, 152 L.Ed.2d 914 (2002)(noting difference between "objectively unreasonable" application under AEDPA and one that is merely "incorrect"); *Williams,* 529 U.S. at 409-11, 120 S.Ct. at 1521-22.

■ However, this deference scheme applies only to issues that have been adjudicated on the merits in state court. A resolution or "adjudication" on the merits in the habeas-corpus context is a term of art that refers to the state court's disposition of the case on substantive rather than procedural grounds. *See Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir.), *cert. denied,* 531 U.S. 849, 121 S.Ct. 122, 148 L.Ed.2d 77 (2000); *Green v. Johnson,* 116 F.3d 1115, 1121 (5th Cir.1997). All of the claims Petitioner makes here that were either denied by the Texas Court of Criminal Appeals on the merits in his direct appeal, or after explicitly adopting findings of fact and conclusions of law made by the state trial court, denied relief on the mer-

its of the state habeas application,[10] may be said to have been "adjudicated on the merits" under 28 U.S.C. § 2254(d). *See Hill v. Johnson,* 210 F.3d 481, 485 (5th Cir.2000), *cert. denied,* 532 U.S. 1039, 121 S.Ct. 2001, 149 L.Ed.2d 1004 (2001); *Valdez v. Cockrell,* 274 F.3d 941 (5th Cir. 2001). Therefore, each of these claims is subject to this heightened-deference standard. Not only must Petitioner meet this heightened standard in order to obtain relief, but his allegations must also be sufficient to show that such standard can be met before an evidentiary hearing will be warranted.

### Evidentiary Hearings

■ When there is a factual dispute, that, if resolved in the petitioner's favor, would entitle him to relief and the state has not afforded the petitioner a full and fair evidentiary hearing, a federal habeas-corpus petitioner is entitled to discovery and an evidentiary hearing. *See Hughes v. Johnson,* 191 F.3d 607 (5th Cir.1999)(quoting *Goodwin v. Johnson,* 132 F.3d 162, 178 (5th Cir.1997)) The AEDPA raised the standards for obtaining relief on claims governed by 28 U.S.C. § 2254(d) so that now the allegations of the petition must be sufficient to demonstrate that this higher standard can be met before an evidentiary hearing will be warranted. Further, the AEDPA eliminated the requirement of a "full and fair hearing" in state court before according deference to state-court findings. *Valdez,* 274 F.3d at 948.[11] Also, the AEDPA expressly limits the availability of an evidentiary hearing when the habeas petitioner has failed to develop the factual basis of the claim in the state-court proceedings. *See* 28 U.S.C.

§ 2254(e)(2). Each of these requirements imposes additional restrictions on the ability of federal courts to grant evidentiary hearings and relief in post-conviction habeas-corpus proceedings. Therefore, although the full effect of the AEDPA on the initial determination of whether to grant an evidentiary hearing is not certain, the intent of the AEDPA is clearly to limit such federal-court action. Since the allegations of the petition before this Court, even if taken as true, would fail to establish petitioner's right to federal habeas-corpus relief, no further discovery or evidentiary hearing is necessary. Accordingly, all discovery not already completed has expired in accordance with the *Order Terminating Discovery* granting *Respondent Cockrell's Motion for Reconsideration of Order Authorizing Limited Discovery* (filed under seal).

## VII. FACTUAL BACKGROUND

The Texas Court of Criminal Appeals recited the following factual background in its opinion on direct appeal:

> The victim, her sister Linda Gail Wadle, and a friend Kimberly Pursley, shared a two-bedroom apartment at One Way Place in Dallas. All were employed by Braniff International Airlines as flight attendants.
>
> On the morning of Wednesday, November 1, 1978, Pursley was alone in the apartment. The previous day she had been assigned to a flight bound for Hawaii and arranged to meet her father at a local restaurant the next morning to borrow $100 for the trip. When she left her apartment at 11:40 a.m. she was already ten minutes late. She arrived at

---

**10.** Under Texas law, a denial of relief by the Court of Criminal Appeals serves as a denial of relief on the merits of the claim. *Miller,* 200 F.3d at 281 (*citing Ex parte Torres,* 943 S.W.2d 469 (Tex.Crim.App.1997)).

**11.** While reaffirming the *Goodwin* standard for the initial grant of an evidentiary hearing, the Fifth Circuit Court of Appeals in *Valdez* stated held that "a full and fair hearing is not a prerequisite to the application of Epha's deferential framework." 274 F.3d at 948.

the restaurant at about 11:50 and shared lunch with her father until he had to leave at 12:30 p.m. After receiving five $20 bills from him and placing them inside her checkbook, she returned directly to her apartment.

Upon arriving she noticed the victim's suitcase near the front door and concluded that her roommate had returned sooner than expected from her last flight. The victim's purse was on the living room sofa with many of its contents scattered about. Pursley set her own purse down next to it. Almost immediately she heard a male voice from behind a closed bedroom door say, "Don't come in here. Stay out there." Assuming that the man was a friend of the victim's, she replied, "Don't worry, I won't come in."

Pursley stood in front of the television set for a moment, watching an afternoon soap opera. Shortly, the bedroom door opened and she heard a voice behind her say, "Hi." Turning, she observed a man lean through the doorway with one hand on its molding and snapping closed a knife sheath with the other. Before she could introduce herself, he said, "I'm with maintenance, I came to check and change the air conditioner filters," and pointed toward the bedroom ceiling.

Pursley stuck her head through the doorway but could see no ductwork (sic) in the vicinity. Then, lowering her gaze, she noticed the nude body of the victim protruding spread eagle from beneath the bed. As she turned toward the man he grabbed her by the throat with both hands and threw her to the living room floor on her stomach, saying, "Don't move or I'll break your [expletive deleted] neck."

Soon she heard him rummaging through the bedroom and then the sound of cloth tearing. In a moment he returned, gagged her with a Braniff uniform sash, tied her hands with a leather belt, and covered her head with an apron. She then heard him sit down in the bedroom and ask, "Do you have any money?" Thinking he was talking to the victim, she made no reply, but when he asked again she shook her head to indicate "No." Then, remembering a $20 bill in her wallet, she nodded her head affirmatively.

The man next proceeded to the sofa and began searching through the contents of both purses. He made several circuits of the apartment during which he drank water from a glass in the kitchen and looked through the bedroom and living room areas. After a time he returned to Pursley. Straddling her with his legs, he placed both hands at her throat and began strangling her. When the pain became almost more than she could bear, Pursley feigned unconsciousness. The man released and briefly reapplied pressure. Removing the apron from her face, he threw it to the floor, circled the apartment once again and left.

Pursley jumped to her feet, pulled free of her bindings, and locked the front door. She then rushed to check on the victim and found blood oozing from her mouth, gaze fixed, and hands tied tightly behind her back with a telephone cord. Around her neck were a plastic bag and belt pulled taut.

Pursley ran to the front door, opened it, and screamed for help. A neighbor, Rosemary Asencio, appeared and while Pursley used her telephone to call for help, went to investigate the victim's condition. She found the young woman lying naked on her back, legs spread apart, and breasts exposed. With some difficulty she removed the plastic bag and belt from around the victim's neck and began cardiopulmonary resuscitation, which she continued until emergency medical technicians arrived about 15 minutes later.

The victim died after nine days in the hospital without ever regaining consciousness. There is no evidence that her assailant sustained any bodily injury during the episode.

Shortly after [Reed's] arrest on December 16, 1978, Pursley identified [Reed] in a corporeal line-up as the man who attached her in her apartment. Two other residents at Pursley's apartment complex, Mikki Flanagan and Phil Hardin, identified [Reed] at the same line-up as the person they had seen in the complex shortly before the time of the attacks on the victim and Pursley. Flanagan testified [Reed] came to the door of her apartment shortly after noon on November 1 and told her that he had come to check the air conditioning filters. Hardin testified he saw [Reed] in the complex around noon on November 1 wearing a red shirt and blue jeans similar to the ones Pursley and Flanagan testified [Reed] had worn.

A witness placed [Reed] at the scene of the instant offense immediately after [Reed] left the victim and Pursley's apartment. At the time of the instant offense, Ken Ezelle worked as a maintenance man at the apartment complex. Ezelle identified [Reed] at trial as the man he saw running away from the area of the victim's and Pursley's apartment at the same time he heard Pursley screaming for help.

At trial, William McLean testified that he and [Reed] were in custody together at the Dallas County Jail during May of 1982. McLean stated that on May 18, [Reed] admitted that he robbed, attempted to sexually assault and killed a woman in her apartment.

*Reed*, No. 69,292, slip op. at 1–4. This Court accords a presumption of correctness to these state court findings. 28 U.S.C. § 2254(d).

## VIII. EXAMINATION OF THE ISSUES

### A. Claims related to testimony of William McLean.

In his first ground for federal habeas corpus relief, Petitioner alleges that the prosecutors at his trial knowingly presented and failed to correct perjured testimony by witness William McLean in violation of Petitioner's rights to Due Process and a Fair Trial under the Fifth and Fourteenth Amendments to the Constitution. The amended petition for writ of habeas corpus filed herein alleges that the testimony of William Samuel McLean, Jr. at Petitioner's trial was false in two respects. First, the petition alleges that McLean testified falsely at Petitioner's trial that Petitioner confessed to committing an offense matching the facts of this case,[12] as shown by the fact that McLean later recanted his testimony, stating that no such confession occurred. (Am.Pet. pp. 17–18.) Second, the petition alleges that McLean testified falsely at trial that he had been promised nothing by the prosecution in exchange for his testimony,[13] as shown by the fact that

12. Clear testified that Reed confessed to posing as a maintenance man, robbing, sexually assaulting and strangling a woman in her apartment, leaving her for dead and then robbing and strangling another woman that then came into the apartment and leaving her also for dead. (OF XII, p. 28–30.) These facts appeared to match those of the offense for which Reed was incarcerated with Clear.

13. Clear also testified that he had made no promises with the prosecutor in exchange for his testimony, that he had already "pled out on the cases" resulting in the prison sentences he was serving, and that he testified of his own free will. (OF XII, p. 31–33, 64.) He was then extensively cross-examined by Reed's defense counsel at his trial. (OF XII, p. 33–62, 65.) Reed's attorneys also presented the testimony of another inmate to impeach Clear. (OF XII, p. 109–16.)

McLean's subsequent counsel indicated that there were "some promises" that had not been kept. (Am.Pet., pp. 17–18, 20.)

 It is settled that the prosecution may not knowingly use perjured testimony or allow perjured testimony to go uncorrected. *See Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959); *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). To prove a due process violation in such a case, a petitioner must demonstrate that (1) the testimony was actually false, (2) the state knew it was false, and (3) the testimony was material. *See Hill v. Johnson*, 210 F.3d 481, 488 (5th Cir. 2000) *cert. denied*, 532 U.S. 1039, 121 S.Ct. 2001, 149 L.Ed.2d 1004 (2001) (citing *Pyles v. Johnson*, 136 F.3d 986, 996 (5th Cir. 1998)).

 The inherent nature of any agreements with the prosecution is of a nature that if the allegation of such perjury is true, the prosecution would have known of the alleged falsity. However, the petitions for habeas corpus relief filed here and in the state court contain no allegation that agents of the state knew of any falsity in McLean's testimony concerning Petitioner's confession. Therefore, such petitions failed to state the required element of knowledge by the prosecution of this portion of McLean's testimony. Petitioner later presented a declaration from Martin Luff, a law school student assisting Petitioner's counsel.[14] In this declaration, Luff states that McLean told him not only that he informed the prosecutors before Petitioner's trial that no confession had occurred, but also that the prosecutors assisted McLean in fabricating testimony against Petitioner. (Luff Decl., pp. 2–3.) Assuming that these material new factual allegations could be incorporated into the amended habeas petition in this Court, this Court granted Petitioner leave to conduct the deposition of McLean in order to develop and present this testimony in lieu of an evidentiary hearing. "Order Authorizing Limited Discovery," Nov. 30, 2001.

 Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court. 28 U.S.C. § 2254(b) and (c) require that state prisoners give state courts a fair opportunity to act on their claims before he presents those claims to a federal court in a habeas petition. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 843–44, 119 S.Ct. 1728, 1732, 144 L.Ed.2d 1 (1999). Therefore, a habeas petitioner fails to exhaust state remedies when he presents material additional evidentiary support to the federal court that was not presented to the state court. *See Dowthitt v. Johnson*, 230 F.3d 733, 745 (5th Cir.2000), *citing Graham v. Johnson*, 94 F.3d 958, 968 (5th Cir.1996); 28 U.S.C. § 2254(b)(3). Since Petitioner did not allege or present anything to the state court to suggest that the prosecutors knew that this testimony of a jailhouse confession was false, he has failed to give the state courts a fair opportunity to act on this claim. He has, therefore, failed to exhaust his remedies in state court and the provisions of § 2254(b) apply.

 Accordingly, this Court can only grant relief if there is an absence of available State corrective process, or circumstances exist that render such process ineffective to protect the rights of Petitioner. 28 U.S.C. § 2254(b)(1)(B) (2001). Article 11.071 of the Texas Code of Criminal Procedure provides a method upon application

---

**14.** The Declaration of Martin Luff (hereafter also "Luff Declaration" and "Luff Dec.") is dated August 4, 1999, and was first observed by the Court as an attachment to *Petitioner's* *Reply to Respondent's Answer, Opposition to Motion for Summary Judgment, and Motion for Evidentiary Hearing* filed in this cause on December 22, 1999.

for writ of habeas corpus to raise such a complaint and to present such evidence in order to obtain relief on state habeas corpus. Therefore, the state has provided a corrective process fully capable of adjudicating these claims that has not otherwise been shown ineffective to protect the rights of Petitioner. However, the Texas court to which Petitioner would present this claim would now find it barred under the Texas abuse-of-writ doctrine. TEX. CRIM. PROC. CODE ANN., ART. 11.071, § 5 (Vernon 2000).

 Therefore, Petitioner's claim must now be considered procedurally defaulted for purposes of federal habeas review, and this Court cannot grant relief [15] on this unexhausted claim absent a showing of cause and prejudice or a fundamental miscarriage of justice. *See Jones v. Jones*, 163 F.3d 285, 296 (5th Cir.1998), *cert. denied*, 528 U.S. 895, 120 S.Ct. 224, 145 L.Ed.2d 188 (1999). The fundamental miscarriage of justice exception is available only where the prisoner supplements his constitutional claim with a colorable showing of factual innocence. *See Herrera v. Collins*, 506 U.S. 390, 404, 113 S.Ct. 853, 862–63, 122 L.Ed.2d 203 (1993). In an effort to satisfy this exception to the imposition of a procedural bar, Petitioner requested and was granted discovery to compare unidentified fingerprint evidence obtained from the scene of the underlying offense with unidentified fingerprint evidence recovered from the scenes of three other factually-similar offenses,[16] in order

to develop the evidence that may be available to avoid such bar. "Order Authorizing Limited Discovery," Nov. 30, 2001. After further clarification of this discovery order, "Order Clarifying the Court's Prior Order Authorizing Limited Discovery," Apr. 9, 2002, and safeguards granted to protect the rights of the witness, Petitioner conducted the deposition of McLean on July 9, 2002.

Petitioner was also able to explore his claim that the prosecution had made "some promises" to McLean in exchange for his testimony at the deposition as authorized by the Order Clarifying the Court's Prior Order Authorizing Limited Discovery, even though such allegations were insufficient to independently authorize discovery. *Id.* After considering this deposition, a copy of which has been filed under seal with this Court, and the arguments of counsel presented in briefs and motions before this Court, it is the opinion of this Court that the evidence does not support either of Petitioner's claims that the prosecution knowingly used perjured testimony at his trial. Since Petitioner's claims are without merit, there is no further need to develop any exception to the imposition of any procedural bar, and the prior orders of this Court have now been modified to deny such additional discovery as moot. *See Bledsue v. Johnson*, 188 F.3d 250 (5th Cir.1999) (finding that even though claims were not barred, they lacked merit and therefore habeas relief was not warranted). Petitioner's first claim for relief should be denied.

---

**15.** However this Court may proceed to consider and deny the merits of an unexhausted claim. 28 U.S.C. § 2254(b)(2).

**16.** The three other offenses were the murders of Cheryl Sue Bellinger, Beverly Bruneau, and Jeeta Lynn Graeber. Even though each of these offenses shared some similar facts, they also differed from each other and from the facts of the offense for which Reed has now been twice convicted in state court. The

similarity of at least one of these other murders was also known to Reed's attorneys prior to his retrial in 1983. In fact, the Bellinger murder appears to have formed the basis for Reed's out-of-time motion for new trial, which was granted and resulted in the retrial and present conviction and death sentence of Petitioner. By separate order of even date herewith, this prior grant of discovery is terminated.

## B. Claimed discriminatory use of peremptory challenges.

In his second, third, fourth, fifth, sixth and seventh claims for federal habeas corpus relief, Petitioner claims that his rights under the Sixth and Fourteenth Amendments to the Constitution have been violated by the prosecutor's use of peremptory challenges to remove African–American members of the venire. His argument is based entirely on the Fourteenth Amendment Equal Protection guarantees expressed in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). (Am.Pet., pp. 25–55). Therefore, these claims will be analyzed under the standards applicable to such Equal Protection grounds.

### Evaluating Batson *claims*

The Supreme Court has provided a three-step process to determine whether a prosecutor has exercised peremptory challenges in a manner that violates the Equal Protection Clause of the Fourteenth Amendment to the Constitution. *See Batson,* 476 U.S. at 96–98, 106 S.Ct. 1712 (1986); *Hernandez v. New York,* 500 U.S. 352, 358–59, 111 S.Ct. 1859, 1865–66, 114 L.Ed.2d 395 (1991). First, the defendant at voir dire must make a prima facie showing that the prosecutor exercised it on the basis of a juror's cognizable racial background. *See Batson,* 476 U.S. at 96–97, 106 S.Ct. 1712; *Hernandez,* 500 U.S. at 358, 111 S.Ct. 1859; *Soria v. Johnson,* 207 F.3d 232, 237 (5th Cir.2000), *cert. denied,* 530 U.S. 1286, 121 S.Ct. 2, 147 L.Ed.2d 1027 (2000). Second, the burden then shifts to the proponent of the strike to articulate a race-neutral explanation for removing the potential juror in question. *See Batson,* 476 U.S. at 97–98, 106 S.Ct. 1712; *Hernandez,* 500 U.S. at 358–59, 111 S.Ct. 1859; *Soria,* 207 F.3d at 237, 239. Finally, the trial court must determine whether the opponent of the strike has carried his burden of proving purposeful discrimination. *See Batson,* 476 U.S. at 98, 106 S.Ct. 1712; *Hernandez,* 500 U.S. at 359, 111 S.Ct. 1859; *Soria,* 207 F.3d at 239.

Even though this process involves a shifting of the burden of proof, the ultimate burden of persuasion rests with, and never shifts from, the opponent of the strike. *See Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995); *Soria,* 207 F.3d at 239. Once the trial court makes a determination of this ultimate question of discriminatory intent, such decision constitutes a finding of fact entitled to great deference. *See Hernandez v. New York,* 500 U.S. at 364, 111 S.Ct. 1859. This is due in large part to the importance of the findings on credibility. *Id.* at 365, 111 S.Ct. 1859. Such deference standard existed prior to the AEDPA, and therefore remains an applicable standard independent of the AEDPA. However, since Petitioner has questioned the applicability of the AEDPA's deference standard, this Court will conduct an analysis of the appropriate standard of review to apply specifically to his *Batson* claims.

### Standard of Review

■ Petitioner argues that the deference standards contained in 28 U.S.C. § 2254(d) are inapplicable to his Batson claims because such claims were not "adjudicated on the merits" in state court. Accordingly, he argues that his *Batson* claims should now be reviewed *de novo,* including a new evidentiary hearing in this forum, because the Texas Court of Criminal Appeals did not consider his comparative analysis argument. This Court disagrees.

In *Mercadel v. Cain,* 179 F.3d 271, (5th Cir.1999) the Court of Appeals stated,

In this circuit, the question of whether a state court's decision is an adjudication on the merits turns on "the court's disposition of the case—whether substantive or procedural." *Green v. Johnson,* 116 F.3d 1115, 1121 (5th Cir.1997)(dis-

cussing whether state court's decision constituted a resolution on the merits, the pre-AEDPA equivalent of an adjudication on the merits); *see Fisher v. Texas* 169 F.3d 295, 299–300 (5th Cir.1999)(applying *Green* to adjudication on the merits analysis). Under the test outlined in *Green*, we determine whether a state court's disposition of a petitioner's claim is on the merits by considering: (1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state courts' opinions suggest reliance upon procedural grounds rather than a determination on the merits.

*See also, Miller,* 200 F.3d at 281; *Fisher v. Texas,* 169 F.3d 295, 300 (5th Cir.1999) (*Batson* issue found not "adjudicated on the merits" in state court under 28 U.S.C. § 2254(d)).[17] Applying this to the record of this case convinces this Court that both Reed's direct criminal appeal and state habeas application were denied based upon the merits of his *Batson* claims.

Under the first part of the inquiry, this Court considers what the state courts have done in similar cases. Petitioner has directed this Court to three Texas cases in which the issue of comparison analysis arguments were presented for the first time

on appeal: *Tompkins v. State,* 774 S.W.2d 195 (Tex.Cr.App.1987); *Young v. State,* 826 S.W.2d 141 (Tex.Cr.App.1992); and *Cornish v. State,* 848 S.W.2d 144 (Tex.Cr. App.1993).[18] The first of these cases, *Tompkins v. State,* bears the most similarity with Reed's case. Both are capital murder case wherein the death penalty was sought. In both cases, the voir dire occurred before the Supreme Court's pronouncement in *Batson v. Kentucky,* which was announced during the pendency of the appeals. In both cases, the Texas Court of Criminal Appeals remanded the cases to the trial courts for a *Batson* hearing some time after the original trial. In both cases, there was nothing in the record of the *Batson* hearing to suggest that the trial court either independently recalled the voir dire proceedings conducted over a year earlier, admitted the transcript of such voir dire proceedings, or was requested by the appellant's attorney to even consider any comparative analysis between the state's reasons given at the *Batson* hearing and the record of such voir dire proceedings. Finally, in both cases the opinion of the Texas Court of Criminal Appeals purports to deny the *Batson* complaints on their merits while deciding to not apply the comparison analysis requested by the appellants.[19]

In *Young v. State,* a non-capital case, the Texas Court of Criminal Appeals distin-

---

**17.** In *Fisher,* the Court of Appeals stated, "The Texas Court of Appeals's awareness of, and explicit reliance on, a procedural ground to dismiss Fisher's claim is determinative in this case, and we therefore cannot apply the AEDPA deference standards to the state court's findings and conclusions." 169 F.3d at 300.

**18.** Petitioner's argument from these cases appears to concern itself more with defending against the imposition of a procedural bar than the determination of whether the state court's adjudication itself was substantive or procedural. Even though these concepts are

closely related, Respondent is not claiming such a bar and this Court sees no reason to raise the issue of such a bar sua sponte. Therefore, this Court will confine itself in its review of such cases to the issue of whether the Petitioner's *Batson* claims have been adjudicated on the merits.

**19.** The pertinent language from the opinion of the Texas Court of Criminal Appeals in *Tompkins* is as follows:

At the "Batson" hearing that this Court ordered, see *ante,* though certainly afforded the opportunity to do so, appellant did not attempt to compare the five complained

guished *Tompkins* as a death penalty case wherein different factors applied to jury selection. In declining to adopt certain statements from footnote 6A in *Tompkins* as a holding of the court applicable to non-capital cases, the state court stated,

> Moreover, *Tompkins,* was a capital murder case, to which the pronouncement in footnote 6A may be more appropriately applicable. Voir dire for a capital murder trial generally runs for weeks, with hundreds of questions and thousands of pages of transcription, making it extremely difficult for the trial judge, as well as the parties, to remember discrepancies in the voir dire of the various veniremembers who are questioned individually. In contrast, voir dire in a trial for a non-capital offense is done before the full jury panel rather than individually, usually lasts less than a day, and all peremptory challenges are made at its conclusion. Discrepancies in the voir

dire of the various veniremembers can be readily determined by the trial judge during the procedure, and comparisons of the challenged prospective jurors with those not struck can be made contemporaneously with the use of the peremptory strikes.

Each of these distinguishing factors also distinguish *Young* from Reed's case, and are even more applicable to *Batson* hearings conducted long after the capital voir dire and when the trial court is less likely to remember and is not otherwise directed to the comparison evidence. Further, in *Young* the Texas Court of Criminal Appeals was careful to confine its consideration of new arguments made for the first time on appeal to evidence admitted before the fact finder, and it expressly disallowed arguments from evidence not presented to the trial court. *Young,* 826 S.W.2d at 146.[20] Finally, the state court in *Young* was careful to identify the comparison

---

about black venirepersons who were not challenged by the prosecution.[6A]

6A. In a supplemental brief, filed on September 28, 1987, appellant has offered just such a comparison, inviting this Court to employ the record of jury selection that exists in this cause to impeach or rebut testimony given by the prosecutors at the *"Batson"* hearing, *supra.* The point is well-taken and does cast considerable doubt upon the neutral explanations offered by counsel for the State. Had the matter been pressed by defense counsel during his cross-examination of the prosecutors, or otherwise brought before the trial judge at the *"Batson"* hearing, it might have materially affected the trial judge's ultimate findings of fact.

However, even though the trial judge might have judicially noticed or independently recalled from the jury selection process, there is nothing in the *"Batson"* hearing to suggest that she was requested to do so. In short, at the *"Batson"* hearing counsel for appellant gave no indication to the trial judge that he wanted her to consider the credibility of any neutral explanation offered by the State based upon the manner in which similarly-situ-

ated white veniremen were treated during voir dire.

We point out that, at a hearing conducted pursuant to *Batson,* the trial judge is the factfinder, and it is his responsibility to weight the evidence and determine the credibility of witnesses. A reviewing court should reverse his findings only when they are not supported by sufficient evidence or, as we often say, for an "abuse of discretion." Because the trial judge was not urged to make, and did not make, a finding based upon a comparison analysis in deciding the issue whether the prosecutor's neutral explanations were rebutted or impeached at the *"Batson"* hearing with evidence that unchallenged white veniremen also possessed the same purportedly undesireable (sic) characteristics, we do not consider this circumstance in reviewing the trial judge's findings in this cause.

*Id.* at 202.

20. In *Young,* the Court of Criminal Appeals stated "[B]y our ruling today, we are not allowing appellant to raise matters on appeal which were not raised in the trial court. On the contrary, our ruling merely allows appel-

analysis argument as merely one tool that a court might use to analyze a *Batson* claim, and is not itself an independent claim. *Young*, 826 S.W.2d at 150–51 (opinion denying rehearing).[21] Clearly, determining that the use of such an analytical tool would be inappropriate in a given case is not the same as refusing to consider the merits of a claim.

The third case Petitioner cited actually emphasized the importance of directing the trial court to the information necessary for the comparison analysis. In *Cornish v. State*, 848 S.W.2d at 145, the Texas Court of Criminal Appeals allowed a non-capital defendant to present his comparison analysis argument from juror information cards not formally introduced into evidence. This was because the appellant's attorney had specifically directed the trial court to the juror information cards for the purposes of a comparison analysis.[22]

From these cases, and this Court's own review of similar state cases, it is apparent that the comparison analysis argument has been used in the Texas state courts as an analytical tool to make or review *Batson* findings and has not itself been used as a procedural obstacle to bar consideration of such claims. Further, the use of this analytical tool has been confined to the information actually in evidence or otherwise brought to the attention of the state fact finder at a *Batson* hearing. Finally, by the time the state court decided Reed's direct appeal, the state court had distinguished its usefulness to exclude the voir dire of capital cases wherein the death penalty is sought.

Under the second and third parts of this inquiry, the history of Reed's appeal suggests that the state courts on direct appeal were not aware of any ground for not

---

lant to argue *what is in evidence* from the voir dire and the *Batson* hearing and *why he should prevail* on his *Batson* claim." (Emphasis in original) *Id.* (Footnote omitted).

**21.** In *Young*, the Court of Criminal Appeals stated in its opinion denying the state's motion for a rehearing,

"Moreover, a comparative analysis is not a new or different legal theory, from the *Batson* claim asserted in the trial court, upon which a defendant seeks relief on appeal. As stated on original submission, the comparative analysis is merely the argument accompanying the *Batson* claim. *See* p. 145. The legal theory which the defendant asserts during the voir dire process, that the prosecutor has engaged in purposeful racial discrimination, is the same legal contention raised on appeal. The comparative analysis *is but an analytical tool that the appellant* uses on appeal to show that the trial judge's ruling on his the *Batson* claim was not supported by the voir dire record and thus was clearly erroneous; it is not the legal theory upon which relief is sought. The legal claim is the same at trial and on appeal: the State used racially motivated peremptory challenges during its jury selection."

**22.** In *Cornish*, the Texas Court of Criminal Appeals stated,

In *Young v. State*, 826 S.W.2d 141 (Tex. Crim.App.1991), we held that while a defendant is not required to request the trial court make a comparison analysis of the reasons given for striking various venirepersons in order to preserve the issue for an appellate determination, such defendant is limited to the evidence in the record to support such analysis. In *Vargas* we faced a situation in which reliance was had on juror information cards which were not before the trial court. We held that these cards could not be used by an appellate court in evaluating a *Batson* claim. *Vargas*, 838 S.W.2d at 556–57. But, in this case, defense counsel specifically referred to the juror information cards for the purposes of a comparison analysis and the trial court replied that, "[t]he cards will speak for themselves."

From this exchange, it is apparent that the parties and the trial judge regarded the juror information cards as a significant part of the evidence upon which a resolution of appellant's *Batson* claim would depend.

848 S.W.2d at 145.

adjudicating Reed's *Batson* claims on the merits and, in fact, made a concerted effort to address the merits of Petitioner's *Batson* claims. Also, in the state post-conviction habeas-corpus proceeding, the state courts reconsidered such issues and especially the use of comparative analysis in death penalty cases. The state court refused to apply Reed's comparison analysis to the *Batson* findings for several reasons, including Reed's failure to present evidence before the trial court upon which to make such arguments and the logical inapplicability of such analysis to the voir dire of a death penalty case.[23] Therefore, even though the state courts did not use Reed's comparison analysis argument, the state court disposition of the case was based on a careful analysis of the merits of Reed's *Batson* claims as available from the record of the *Batson* hearing. *Reed*, No. 69,292, slip op. at 15–34. Further, an examination of the state court's treatment of Reed's *Batson* claims reveals that the state court went to considerable effort to consider such claims.

Even though Reed's voir dire and trial occurred before the Supreme Court's pronouncement in *Batson v. Kentucky*, and before the trial court had any obligation to conduct a hearing on Petitioner's claims, the state court's care in dealing with such claims resulted in an extraordinary opportunity for just such a hearing. One week after Petitioner's direct appeal was submitted to the state's highest court, the Supreme Court announced its decision in *Batson*. *Reed*, No. 69,292, slip op. at 15. Thereafter, the Texas Court of Criminal Appeals did not dispose of the appeal[24] until such time as Petitioner, a Caucasian male, acquired a right to the application of *Batson* in his appeal.[25] It then remanded the case to the trial court in order to conduct an evidentiary hearing (the "*Batson* hearing") on Reed's *Batson* claims,[26] explaining that Reed had been denied an opportunity to cross-examine the prosecuting attorneys regarding the nature of their race-neutral explanations. *Reed*, No. 69,-292, slip op. at 17, (quoting *Reed v. State*,

**23.** In refusing the apply the comparison analysis on direct appeal, the Court of Criminal Appeals stated,

> Appellant presents this argument for the first time in this supplemental brief. He did not make his disparate treatment argument at the *Batson* hearing, or at his trial.Appellant did not question the trial prosecutors when he had them under oath at the Batson hearing or the trial court about this issues of disparate treatment of Osby, Jones, Johnson, Alberty, and Gaut.

*Reed*, No. 69,292, slip op. at 25. In distinguishing this case from *Young v. State*, 826 S.W.2d 141 (Tex.Crim.App.), the state court noted the unavailability of this analysis before the trier of fact:

> This distinction is greater in the instant capital murder case where the *Batson* hearing and the trial court's assessment of the state's race neutral explanations occurred, on remand, years after the voir dire was originally conducted. These explanations were in no way contemporaneous with any of the voir dire. When the trial court told appellant on direct examination at the *Bat-*

> *son* hearing that he had not reviewed the rest of voir dire, he drew appellant's attention to the fact that he would not have been aware of any disparities between the voir dire of the five veniremembers and the rest of the panel. Yet, appellant pointedly did not present to the trial court argument or evidence that any disparities existed, upon which the trial court could then make its findings."

*Id.* at 27.

**24.** The reasons for certain periods of delay in the resolution of Petitioner's direct appeal are not apparent from the record. This Court does not express an opinion regarding the intentions of the state court in this regard.

**25.** *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).

**26.** Footnote No. 2 to this order was frequently cited by Reed's attorney at the *Batson* hearing as suggesting race-neutral reasons to the witnesses who testified at the hearing.

No. 69,292 (Tex.Cr.App. November 18, 1992)).

In its opinion affirming the conviction, the Texas Court of Criminal Appeals dedicated nineteen pages to the discussion of Reed's *Batson* claims, discussing each of Reed's points of error, separately analyzing the evidence to support each finding, and concluding in each case that the trial court's findings were not clearly erroneous. Likewise, the state habeas court dedicated twenty pages to the analysis of Reed's *Batson* issues raised in his post-conviction application in determining that such issues were not only fully addressed on direct appeal, but also in concluding alternatively that such issues lacked merit. (SHR, pp. 681–701.)

Therefore, it appears that the state court has adjudicated Reed's *Batson* claims on the merits in accordance with the AEDPA. 28 U.S.C. § 2254(d)(2) prohibits this Court from granting a writ of habeas corpus with respect to Petitioner's *Batson* claims unless the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the *evidence presented in the State court proceeding*." (Emphasis added.) This suggests that the scope of such review is limited to certain evidence before the state fact finder. *See, e.g., Abu–Jamal v. Horn,* —— F.Supp.2d ——,

2001 WL 1609690 (E.D.Pa.)(holding that the plain meaning of the term confines federal analysis to state court record). In order to determine what is meant by "evidence presented in the State court proceeding" as it applies to the instant case, it is helpful to review the procedural history of this case in state court in order to determine the precise manner in which evidence was received for consideration by the state courts on Petitioner's *Batson* claims.

As stated above, the Supreme Court in *Batson,* set forth a procedure to determine whether a prosecutor has exercised peremptory challenges in a manner that violates the Equal Protection Clause of the Fourteenth Amendment to the Constitution. Even so, the rule announced in *Batson* was "an explicit and substantial break with prior precedent," *Allen v. Hardy,* 478 U.S. 255, 258, 106 S.Ct. 2878, 2880, 92 L.Ed.2d 199 (1986), and was not available to the state trial court at the time of Petitioner's voir dire in 1983. Therefore, when Petitioner's attorneys complained of the prosecutor's use of peremptory challenges to remove African–Americans from the venire, the trial court ruled in accordance with the law and customary practice as it existed at that time when it did not order the prosecutors to justify their use of peremptory strikes.[27]

---

**27.** The state transcript of voir dire proceedings indicates that on January 7, 1983, the following exchange took place immediately after Juror Osby was excused by the prosecutor's exercise of a peremptory challenge and left the courtroom:

MR. ACKELS (Petitioner's trial counsel): Your Honor, I have a motion before we proceed.

THE COURT: Go ahead.

MR. ACKELS: Your Honor, at this time I move the Court to require the District Attorney to state his reasons for exercising his peremptory challenge against Juror No. 1, which is a black female. We believe it was done for discriminatory and racial reasons.

I would like to ask the Court to have the District Attorney state his reason in the record.

THE COURT: Mr. Ackels, I don't feel that I can order the State to do that. As I understand the law, they can exercise their challenge for any reason whatever. I'm not ordering the State to do so.

MR. MACALUSO (the prosecutor announcing the strike): Your Honor, I will state in the record that I do not feel that the law requires me to state whatever reason or reasons that I have to exercise a peremptory challenge. I will state on the record that I did not exercise a peremptory challenge

It was only upon remand to the state trial court for a retrospective *Batson* hearing during Petitioner's direct appeal, that the prosecutor's reasons for exercising his peremptory challenges could be heard and properly considered in light of the Supreme Court's pronouncements in *Batson*, and *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). At this retrospective *Batson* hearing, the trial court received evidence and found based upon the evidence presented that the prosecution tendered credible, race-neutral explanations for its strikes and that

Reed had failed to sustain his burden of proof on these issues.[28] Afterwards, the Texas Court of Criminal Appeals allowed further amendment and arguments concerning the evidence presented at such retrospective *Batson* hearing, and after hearing such additional arguments concluded that no violation of the Supreme Court's pronouncement in *Batson*, had occurred.[29] On post-conviction review, the same state district court found that these issues had been litigated in the prior appeal[30] and again found that the prosecutor's explanations were credible[31] and that

on the venireman because of her being a black female.

MR. CARDEN (prosecutor): Your Honor, I would also like the record to reflect that the Defendant is not black.

MR. ACKELS: Your Honor, I would request the opportunity to take Mr. Macaluso on voir dire to determine his reasons for exercising his peremptory challenge.

THE COURT: Mr. Ackels, if you could bring me a case-that is any case, capital or otherwise-that I could make the State cite why they exercise their peremptory challenge, I'll do so.

MR. ACKELS: Any state?

THE COURT: No, Texas or some federal jurisdiction that might have authority over my actions today. I would be happy to see a case on it, I really would.

(SOF I, pp. 277–79.)

28. The state habeas court, which was also the trial court, quoted from its earlier Findings of Fact and Conclusions of Law Following the Retrospective *Batson* Hearing as follows:

1. The State provided credible, facially race-neutral explanations for the exercise of the State's peremptory challenge of the five black veniremen, sufficient to satisfy the State's burden of going forward with such explanations after the Court of Criminal Appeals concluded that a prima facie case of purposeful discrimination had been made out.

2. The State's attorneys specifically denied having exercised any of the State's peremptory challenges based on the race of the veniremen.

3. No evidence other then (sic) the racial orientation of the veniremen in question

was offered on the issue of the existence of a prima facie case.

4. The defense failed to offer any evidence sufficient to refute the race-neutral explanations offered by the State, and the Court is aware of no basis upon which it should reject the race-neutral explanations.

5. The defense failed to establish that the State's exercise of its peremptory challenges to exclude the five black veniremen in question was even partially based on the race of the veniremen in question. No violation of the Equal Protection Rights of the defendant or the veniremen in question was established to have occurred by virtue of the State's exercise of her peremptory challenges in the instant case . . . . .

*Ex parte Reed*, Cause No. W81–01988–PL(A), finding No. 102 (Crim. Dist. Ct. No. 5, Dallas County, Tex.).

29. *Reed*, No. 69,292, slip op. at 15–34; *Ex parte Reed*, No. W81–01988–PL(a), finding No. 108 (Crim. Dist. Ct. No. 5, Dallas County, Tex.); (SHR, pp. 685–86).

30. The state habeas court found that several of the points raised were procedurally barred from relitigation on habeas corpus since they were the same claims previously raised on direct appeal. Findings of Fact, Conclusions of Law, and Order, *Ex parte Reed*, Cause No. W81–01988–PL(A) in the Criminal District Court Number Five of Dallas County, Texas, finding Nos. 104, 105, 108, 109.

31. For example, the state habeas court found as follows:

119. The Court finds that the State's explanations included a recollection, albeit

Petitioner failed to carry his ultimate burden of proof on these issues. From all of this, it appears that the state court proceeding specifically created to receive evidence and make fact findings on this issue was the retrospective *Batson* hearing conducted in the trial court on remand during the pendency of Reed's direct appeal. Therefore, this Court must determine whether the state court's decision denying Petitioner relief on his *Batson* claims is unreasonable in light of the "evidence presented" at such *Batson* hearing.

■ Petitioner's complaint centers on the decision by the Texas Court of Criminal Appeals to not use the "comparison analysis" argued by Reed in his supplemental appellate brief to show that the race-neutral reasons articulated by the prosecutors at the *Batson* hearing were inconsistent with their treatment of simi-

larly situated venireperson's of different races. In support of his claim, Petitioner relies upon portions of the transcript of the voir dire proceedings purporting to show such inconsistencies in their exercise of peremptory strikes. Therefore, it is necessary to determine whether these portions of the transcript of the voir dire constitute "evidence presented" to the fact finder at the retrospective *Batson* hearing in accordance with the AEDPA so that the proper evidence is considered by this Court in determining whether the state court's *Batson* findings were "unreasonable".

On remand for the *Batson* hearing, Reed's attorneys subpoenaed many documents, including jury questionnaires, computer printouts from juror information cards, and prosecutor training manuals from the Dallas County District Attorney's office, which became part of the record.[32]

vague, of one prosecutor about his concern of having a health care professional on the jury because of the complicated medical testimony involved in the case. The Court finds that, at the retroactive *Batson* hearing, one of the prosecutors testified that his concern prompted the State to challenge two of the veniremen who were either personally involved in the health care field or had a relative who was a health care provider. *Reed*, slip op. at 28, 33; (Prospective Jurors Osby and Gautt (sic)).

120. The Court further finds that the testimony from the two prosecutors involved in the selection of applicant's jury revealed numerous other race-neutral explanations for the State's peremptory challenges to the five veniremen in question. The Court finds that one of the veniremen indicated he would have held the State to a higher burden on guilt/innocence and expressed concerns that serving on a capital jury would affect his employment. *Reed*, slip op. at 20; (Prospective Juror Jones). The Court further finds that at least three of the veniremen in question expressed serious reservations about serving on a death penalty jury, so much so that even should the State carry its burden of proof on the special issues, they would answer the statutory special issues "no" in order to avoid imposing a

death sentence. *Reed*, slip op. at 31, 32, 33; (Prospective Jurors Johnson, Alberty and Gautt). Additionally, the Court finds that one of the veniremembers had been a criminal defendant and had a relative confined in the Texas Department of Corrections. *Reed*, slip op. at 31; (Prospective Juror Johnson).

121. The Court finds that such responses to such basic questions and principles in a death penalty case would give a prosecutor grave concern about these prospective jurors' ability to be fair to the State. Accordingly, the prosecutors testified that similar veniremembers were routinely and habitually challenged in death penalty cases. This Court found each of these reasons to be credible, clear, reasonably specific, and facially race-neutral.

*Ex parte Reed*, No. W81–01988–PL(a) (Crim. Dist. Ct. No. 5, Dallas County, Tex.); (SHR, pp. 522–23).

32. However, only the computer printouts and juror questionnaires were admitted for all purposes The prosecutor training manuals were only admitted for record purposes, even though the trial court allowed an opportunity for its relevance to be shown. Transcript of *Batson* Hearing, pp. 35–36. Reed's attorney never questioned any witnesses regarding

On March 5, 1993, the *Batson* hearing was conducted during which attorneys for the State and Reed questioned the prosecutors at the trial, the defense attorney at trial, the appellate attorney for the State and the trial judge. At this hearing, the attorney for the State specifically questioned the trial prosecutors regarding the testimony of the veniremembers in question, reading from such transcript of voir dire proceedings and pointing out the places in such record where the veniremember's testimony could be found.[33] Reed's attorney objected to such testimony and cross examined the prosecutors primarily regarding their lack of independent memory of jury selection. However, Reed's attorney made no attempt to cross-examine the trial prosecutors regarding the race-neutral reasons tendered to the trial court at the *Batson* hearing, nor did Reed's attorney direct the trial court to any places in the record where comparisons could be made to similar responses from non-African-American veniremembers.[34] The transcript of the voir dire proceedings was not

these manuals, or sought to show their relevance at the *Batson* hearing, and accordingly they were not in the evidence shown to have been considered by the trial court.

**33.** At the *Batson* hearing, the prosecutors testified that although they could not remember the actual reasons for their exercise of peremptory strikes, from their usual and customary practices and their review of the transcript of the voir dire proceedings they were able to reconstruct their probable reasons for the exercise of these challenges. The following illustrative exchange occurred when such evidence was first elicited:

Q. Let me ask you with reference to Ms. Osby, after you reviewed the materials I've referred to earlier whether, based on your practices of jury selection in capital murder cases, you've come to a conclusion as to why the State may have exercised a peremptory challenge against Ms. Osby?

MR. ACKELS (Attorney for Reed): Objection, Your Honor. Based on his practices in jury selection in the fifteen cases he's picked is irrelevant. He must show this witness has some knowledge or independent recollection with regard to these issues. The question, just based on your general practices, is not what is material here. What is material is what happened in this specific case and I object to the question in that regard.

THE COURT: I'll overrule. I'll let him answer. How much weight I'm going to give it, I'll . . .

\* \* \* \* \* \*

I'll overrule. I do give you a running objection. Mr. Keck, I'm concerned with Mr. Macaluso's experience level at the time this juror selection was made. I think that is a part of Mr. Ackel's problem.

As I understand the current state of Batson law, the Court is entitled to take into consideration any historical practices employed by a particular prosecutor in making his or her peremptory challenges, so I think it is certainly at least potentially relevant to me to know what Mr. Macaluso's practices were in 1982 or 1983 when this jury was selected.

MR. KECK (Attorney for the state): Without unduly lengthening the proceeding, I would suggest to the Court that it is going to be our position that, in fact, many of these venireman cannot be recalled by the prosecutors.

In the last retroactive capital murder case I had, *Chambers v. State*, the Court of Criminal Appeals held in unpublished opinion that evidence of a prosecutor's traditional practices in their jury selection, capital murder voir dire, it is evidence that the Court can consider or not consider. It has the discretion to consider it in a retroactive hearing of this type.

Much of the evidence we would offer is going to be of that nature, just so you're aware of that.

(Transcript of *Batson* hearing, pp. 62–64.)

**34.** The state trial court found that "No meaningful attempt at refutation of the reasons expressed by the prosecutors for the exercise of the State's peremptory challenges was offered at the hearing. The Court concludes that none of the facially race-neutral explanations were refuted by the defendant." *Ex parte Reed*, No. W81–01988–PL(a), "Findings of Fact and Conclusions of Law Following Retrospective *Batson* Hearing," p. 20 (Crim. Dist. Ct. No. 5, Dallas County, Tex. Apr. 28, 1993). The state habeas court later noted this finding when it found that "As this Court

admitted into evidence at the *Batson* hearing, nor was any part of it considered by the trial judge other than those portions specifically read into the record by the State.[35] On appeal, the Court of Criminal Appeals held that those portions of the transcript were not part of the evidence presented to the fact finder when it refused to consider Reed's comparison argument.[36]

The "state court proceedings" under 28 U.S.C. § 2254(d)(2) are those regarding Petitioner's *Batson* issues, and hearing wherein the evidence was "presented" was the retrospective *Batson* hearing, and the state finder of fact was the trial court conducting such hearing. In determining whether the trial court's findings were unreasonable in light of the evidence presented at the *Batson* evidentiary hearing, those portions of the voir dire transcript not presented to the state court at such hearing are outside of the scope of the evidence contemplated by the AEDPA in determining that such finding could be unreasonable. Whereas it is not always necessary to introduce a transcript of the voir dire proceedings before a trial court, this Court is persuaded that the portions of the transcript relied upon by Petitioner cannot be said to have been part of the "evidence presented" to the trial court where, as here, (1) the actual voir dire was conducted at a time when the procedure set forth in *Batson* was unavailable to the state court, (2) the state court *Batson* hearing is separated by significant time and circumstance from the actual voir dire, (3) the trial court expresses on the record to Reed's attorney that he does not independently recall the voir dire and had not reviewed the voluminous transcript of voir dire proceedings, and (4) there is no indication in the record that the portions of the transcript of the voir dire proceedings relied upon by Reed in his comparison analysis were ever presented to the trial court before it made its findings of fact and conclusions of law. Therefore, this Court also declines to engage in a comparison analysis with the evidence not presented to the trial court.

In making this determination, the Court realizes that Petitioner also did not have the benefit of *Batson* at the voir dire proceedings. However, Reed was given an ample opportunity to present his comparison analysis argument and evidence to the trial court before it made the fact findings

---

concluded in its original findings of fact and conclusions of law, this Court finds that applicant offered no evidence to refute the prosecutor's race-neutral explanations at the retroactive *Batson* hearing." *Ex parte Reed*, No. W81–01988–PL(a), finding No. 122 (Crim. Dist. Ct. No. 5, Dallas County, Tex.); (SHR, p. 523.)

**35.** The Texas Court of Criminal Appeals stated,

When appellant called the trial court to the stand, the trial court admitted it did not read the entire record of the voir dire, that it had only reviewed the transcript of the voir dire of the five veniremembers in question. This was the only time at the Batson hearing that appellant said, argued, or presented anything regarding the voir dire of the rest of the panel. In its findings of fact and conclusions of law, the trial court cor-

rectly noted that neither side asked it to review the entire record of the 1983 voir dire.
*Reed*, No. 69,292, slip op. at 24–25; (SHR, pp. 229–30).

**36.** The Texas Court of Criminal Appeals stated,

When the trial court told appellant on direct examination at the Batson hearing that he had not reviewed the rest of the voir dire, he drew appellant's attention to the fact that would not have been aware of any disparities between the voir dire of the five veniremembers and the rest of the panel. Yet, appellant pointedly did not present to the trial court argument or evidence that any disparities existed, upon which the trial court could then make its findings.
*Reed*, No. 69,292, slip op. at 27; (SHR, p. 232).

that Reed now asks the Court to disregard. As early as January 15, 1986, the State's appellate attorney provided race-neutral reasons for these strikes that were apparent from the record of the voir dire proceedings.[37] Before, the hearing, Reed's attorneys had full knowledge of the transcript of the voir dire proceedings when they obtained subpoenas for the information that they determined was appropriate to prove their case. During the hearing, Reed's attorneys were allowed to question the trial prosecutors and could have cross-examined them concerning the reasons stated for their use of strikes and concerning any discrepancies apparent from a comparison analysis, pointing out, as did the state at such hearing, the portions of the voir dire transcript supporting their case. However, they chose to not put such evidence before the trial court. Even so, after the hearing Reed's attorneys could have attempted to present to the trial court their comparison analysis of the race-neutral reasons, when the trial court requested[38] and received additional time to make its findings of fact and conclusions of law.[39] Despite all of these opportunities, there is no indication that Reed's attorney ever presented any evidence or argument to the trial court pertaining to such comparison analysis.

The state court was particularly thorough in its findings concerning the circumstances surrounding the exercise of the peremptory challenges and of the retrospective *Batson* hearing that were conducted by the state habeas court. While frankly acknowledging the difficulties posed by the delay in conducting the retrospective *Batson* hearing, the analysis provided by the state trial court supports its conclusions that prosecutors did not violate *Batson* in the exercise of their peremptory challenges.[40] Of particular interest to both

---

37. Appellee's Brief, *Reed v. Texas*, pp. 32–33.

38. On March 29, 1993, the District Court filed a written request with the Court of Criminal Appeals for additional time, which was granted on that same date.

39. The trial court signed its 21–page Findings of Fact and Conclusions of Law on April 28, 1993.

40. The state habeas court found as follows:

> 116. The Court finds that the ten years that have passed since the selection of applicant's jury affected both the parties' and the trial court's ability to recall specific facts about the voir dire. The Court finds that this passage of time was further compounded by the fact that at the time of jury selection the controlling law did not require the proponent of a peremptory challenge to state race-neutral reasons for his challenges. The Court finds that when the applicability of *Batson* is clear at trial and contemporaneous explanation is required, an attorney's lapse of memory would trigger serious concerns, but when a significant amount of time has passed between the trial and the retroactive *Batson* hearing, some

> loss of memory should be expected. Despite the loss in memory, however, the Court finds that applicant was afforded a full adversarial hearing in compliance with *Batson*.
> 117. The Court notes that based on this Court's reading of the remand order from the Court of Criminal Appeals, this Court proceeded at the retroactive *Batson* hearing on the assumption that the Court of Criminal Appeals had already determined that applicant had made a prima facie case of racial discrimination. Therefore, the burden of production shifted to the State to come forward with race-neutral explanations for the five peremptory challenges in question....
> 118. This Court finds that although the State was not able to offer any evidence at the retroactive *Batson* hearing of any personal recollection by the prosecutors of any of the five African–American veniremen in question or of the prosecutor's specific recollection of their reasons for striking these particular veniremen, after reviewing the information available to them, the prosecutors were able to reconstruct their reasons fo the peremptory strikes of all five veniremen in question.

parties is the state court's finding that Petitioner made no attempt to cross-examine the prosecutors or present any evidence regarding the prosecutors reasons for exercising such challenges or their alleged discriminatory intent.[41] Even if the record did not support the state habeas findings, this finding reveals additional obstacles to Petitioner's *Batson* claims.

First, Petitioner must have fairly presented his claims to the highest state court before he will be considered to have exhausted his state remedies. As shown above, Petitioner failed to present the evidence necessary to consider his comparison analysis argument to the trial court. If this is essential to the proper consideration of Petitioner's *Batson* claim, then he has failed to exhaust his state remedies in this respect, and this Court cannot grant him relief on such grounds. 28 U.S.C. § 2254(b). Further, if Petitioner is correct that the Texas Court of Criminal Appeals refused to consider his *Batson* claims upon a procedural bar, then such claims would be subject to a bar in this court on that basis as well. However, this Court finds

that the comparison analysis argument is not essential to the consideration of Petitioner's *Batson* claims, and that the state court's determination is not unreasonable in light of the evidence presented at the *Batson* hearing. Accordingly, relief should be denied on each of Petitioner's *Batson* claims.

### C. Inclusion of alternate theories in general jury instruction.

■ In his eighth ground for federal habeas corpus relief, Petitioner claims that his rights under the Sixth, Eighth and Fourteenth Amendments to the Constitution have been violated when the jury was instructed that it could convict Reed of capital murder if it found that the murder of Wanda Jean Wadle occurred in the course of either robbery or attempted aggravated rape. He relies upon *Schad v. Arizona*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991), which set forth the Fourteenth Amendment Due Process requirements in such cases as applied to the states and *U.S. v. Holley*, 942 F.2d 916 (5th Cir.1991) that sets forth the standards under the 6th Amendment as applied to federal criminal trials.[42] (Am.Pet., pp. 56–

41. The state habeas court found,

> 122. Having determined that the State produced race-neutral explanations for the five peremptory challenges, this Court then proceeded to decide whether applicant has satisfied his ultimate burden of proving a racial motivation for the State's peremptory challenges. **As this court concluded in its original findings of fact and conclusions of law, this Court finds that applicant offered no evidence to refute the prosecutor's race-neutral explanations at the retroactive *Batson* hearing.** Although applicant was given the opportunity to cross-examine the prosecutors on their specific reasons for challenging the five veniremen in question, the Court finds that applicant chose not to. Instead, applicant merely attempted to suggest that the prosecutors' stated explanations were colored by their reading of several "training manuals" and footnote no. 2 of the Court's November 18, 1992 remand order quoting several race-neutral explana-

> tions offered by the State's appellate counsel in the State's brief. Consequently, this Court found that no "meaningful attempt at refutation of the reasons expressed by the prosecutors for the exercise of the State's peremptory challenges was offered or suggested at the hearing." See Findings of Fact and Conclusions of Law, p. 20. Thus, this Court concluded that the applicant failed to carry his ultimate burden on his *Batson* claims. Because this Court's findings of fact and conclusions of law were supported by the record, the Court of Criminal Appeals found they were not clearly erroneous. Again as this Court concluded in its original findings of fact and conclusions of law, this Court finds that applicant has failed to carry his ultimate burden on his *Batson* claims.

> (Emphasis in original).

42. In setting the constitutional limits of state action, a plurality of the Supreme Court ex-

62).

In *U.S. v. Holley*, 942 F.2d at 926, the Court of Appeals discussed the Supreme Court's opinion in *Schad* on the subject of alternative legal theories presented in state jury instructions.

The defendant in Schad was found guilty in an Arizona court of first-degree murder by a unanimous jury verdict and was sentenced to death. The trial court had instructed the jury that it must reach a unanimous verdict that the appellant committed first degree murder, which was defined as premeditated murder or felony murder. The jury was not required to reach a separate verdict with respect to either premeditated murder or felony murder. Appellant challenged his conviction on the grounds of the Sixth, Eighth and Fourteenth Amendments, claiming a constitutional right to a unanimous jury in state capital cases as distinct from cases in which lesser penalties are imposed.

Justice Souter, writing for four justices including himself, authored the Court's opinion. He rejected appellant's Sixth and Eighth Amendment claims on the ground that "petitioner's real challenge is to Arizona's characterization of first-degree murder as a single crime as to which a verdict need not be limited to any one statutory alternative, as against which he argues that premeditated murder and felony murder are separate crimes as to which the jury must return separate verdicts." [*Schad,*] 111 S.Ct. at 2496. Justice Souter stated the central issue as being whether it was constitutionally permissible to allow a "general verdict predicated on the possibility of combining findings of what can best be described as alternative mental states, the one being premeditation, the other the intent required for murder combined

with the commission of an independently culpable felony." *Id.*

This is the precise question in the case before us.

In *Holley*, the Court of Appeals overturned the federal perjury conviction when it determined that different offenses had been combined into a single charge of perjury in the jury instructions. However, the Court of Appeals distinguished *Holley* from *Schad.*

> Holley's case, however, is somewhat different from *Schad.* In *Schad*, there was a single killing of one individual, and Justice Souter, stressing that under Arizona law first degree murder was "a single crime," concluded that there was no more need for jury unanimity as to alternative mental states each satisfying the *mens rea* element of the offense than there was for the jurors to all agree on the precise means employed to cause death. *Id.* 111 S.Ct. at 2495–97.

*Holley*, 942 F.2d at 927. (footnote omitted). *Holley* is similarly distinct from the instant case. The same factors set forth in Justice Souter's opinion in *Schad* upholding the state jury instructions as using alternative methods to charge the single offense of murder, when applied to the instant case lead this Court to the conclusion that Petitioner was charged with alternative means of commission of a single murder offense. The Court comes to this conclusion by determining whether Texas state courts have treated the two alternatives alleged in these jury instructions are merely means of commission of the same offense or independent elements charging inherently separate offenses.

In *Schad*, the plurality opinion refused to set forth a single test or analytical model for determining when two means

plained in a footnote that this was more accurately characterized as a due process right

than as one under the Sixth Amendment. *Schad*, 501 U.S. at 634, n. 5, 111 S.Ct. 2491.

charged are so disparate as to exemplify different offenses. Instead, Justice Souter looked first to the state's own treatment of the alternatives. "If a State's courts have determined that certain statutory alternatives are mere means of committing a single offense, rather than independent elements of the crime, we simply are not at liberty to ignore that determination and conclude that the alternatives are, in fact, independent elements under state law." *Schad,* 501 U.S. at 636, 111 S.Ct. 2491. Then, the Supreme Court looked to history and current practice in other states in determining whether a state has exceeded its discretion in defining offenses. *Id.* at 640, 111 S.Ct. 2491.

Texas courts have historically treated the charging of the underlying felonies in such capital murder cases as alternate theories of committing the same offense. In *Kitchens v. State,* 823 S.W.2d 256, 258 (Tex.Crim.App.1991), the Texas Court of Criminal Appeals upheld jury instructions charging a charge of murder in the course of aggravated sexual assault or in the course of robbery as two alternate theories of committing the same offense. Citing *Schad,* the Texas Court of Criminal Appeals described such alternatives as preliminary factual issues which underlie the verdict. *Id.* This interpretation by the Texas court is consistent with the history and current practice of other states, as noted in the plurality opinion in *Schad.*

In *Schad,* Justice Souter noted that

At common law, murder was defined as the unlawful killing of another human being with "malice aforethought." The intent to kill and the intent to commit a felony were alternative aspects of the single concept of "malice aforethought."

*See* 3 J. Stephen, History of the Criminal Law of England 21–22 (1883).

Although American jurisdictions have modified the common law by legislation classifying murder by degrees, the resulting statutes have in most cases retained premeditated murder and some form of felony murder (invariably including murder committed in perpetrating or attempting to perpetrate a robbery) as alternative means of satisfying the mental state that first-degree murder presupposes.

*Id.* at 640–41, 111 S.Ct. 2491. Murder in the course of an underlying felony was considered an alternative means of satisfying the mental state that capital murder presupposed in *Schad* alongside the other alternative of premeditated murder. Clearly then, murder in the course of one felony is just such an alternative alongside the same murder in the course of another felony. Even though the Texas statute enhances this aggravating factor by an additional specific intent requirement,[43] the same underlying *mens rea* element is being proved in both instances to aggravate a murder to capital murder. The same significant indicators of what Justice Souter explained that we as a people regard as "fundamentally fair and rational ways of defining criminal offenses" draw us to the same conclusion in the instant case. *Id.* at 643, 111 S.Ct. 2491. Therefore, this Court denies Petitioner's eighth ground of habeas corpus relief.

## D. Claimed Ex Post Facto Application denying Circumstantial Evidence instruction.

In his ninth ground for federal habeas corpus relief, Petitioner claims that his rights guaranteed by the principles

---

**43.** To prove capital murder under TEX. PEN. CODE ANN. § 19.03(a)(2), the prosecution must also prove the specific intent to commit murder. *Turner v. State,* 805 S.W.2d 423, 430 (Tex.Crim.App.1991); *Kinnamon v. State,* 791 S.W.2d 84 (Tex.Crim.App.1990); *Morrow v. State,* 753 S.W.2d 372 (Tex.Crim.Ap.1988).

included within the federal constitutional Ex Post Facto Clause, U.S. Const. art. I, section 10, were violated by the refusal of the state courts to require a jury charge on circumstantial evidence. (Am.Pet., p. 63). This claim is without merit.

At the trial, Reed's attorneys objected "to the charge failing to include an instruction on circumstantial evidence and the law of circumstantial evidence standard that the Jury should apply with regard to a circumstantial evidence case." (SOF XXII, p. 137.) The trial court denied this objection.[44] (SOF XXII, pp. 139–40.) Reed again presented this objection in his direct appeal, arguing that the state appellate court should not interpret the law to hold that such an instruction was no longer required, as that would then constitute a violation of the prohibition on ex post facto laws. (Brief for Appellant, pp. 87–88.) However, the Texas Court of Criminal Appeals simply denied relief, stating that "[j]ury instructions on circumstantial evidence are no longer required under Texas law."[45] *Reed v. State*, No. 69,292, slip op. at 73 (citing *Hankins v. State*, 646 S.W.2d 191, 197 (Tex.Cr.App.1983)(opinion on reh'g)).

In both his state and federal applications for writ of habeas corpus, Reed argues that the type of instruction he received in his first trial[46] should have also been given in his second trial,[47] and that the failure of the state courts to do so constituted a violation of the constitutional prohibition of ex post facto laws. (State habeas record "SHR", pp. 84–89; Am. Pet., pp. 62–66.) This argument relies upon the fourth *Calder* category of prohibited ex post facto laws, which Reed claims was violated by the intervening opinion of the Texas Court of Criminal Appeals in *Hankins*, which eliminated an instruction and thereby "worked a change substantially reducing the prosecution's burden" of proof. (Am. Pet., p. 65.) In her answer, Respondent countered that the fourth category of ex post facto violations listed by the Supreme Court in *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798), was no longer a valid prohibition, but that, even if it was, the intervening state decision did not diminish the prosecution's burden of proof: "It simply abolished a jury instruction

---

**44.** In denying this objection, the trial court noted that it had made several modifications to the court's charge in response other objections made in a charge conference. (SOF XXII, p. 140.)

**45.** In a footnote, the Texas Court of Criminal Appeals noted that *"Hankins v. State* was decided March 1, 1983. The Appellant's trial commenced March 8, 1983. The rule set forth in *Hankins* has been applied to cases tried after March 1, 1983." *Id.* at 74, n. 18. (citations omitted).

**46.** In Reed's 1979 trial, the trial court instructed the jury, in part, as follows:

In order to warrant a conviction of a crime on circumstantial evidence, each fact necessary to the conclusion sought to be established must be proved by competent evidence, beyond a reasonable doubt; all the facts (that is, the facts necessary to the

conclusion) must be consistent with each other and, taken together, must be of a conclusive nature, leading on the whole to a satisfactory conclusion and producing, in effect, a reasonable and moral certainty that the accused, and no other person, committed the offense charged.

But in such cases it is not sufficient that the circumstances coincide with, account for, and therefore render probable the guilt of the defendant. They must exclude, to a moral certainty, every other reasonable hypothesis except the defendant's guilt; and unless they do so, beyond a reasonable doubt, you will find the defendant not guilty.
(Tr., pp. 246–47.)

**47.** In Reed's 1983 trial, the trial court's instructions contained only the general provisions regarding the presumption of innocence and the prosecution's burden to prove guilt beyond a reasonable doubt. (Tr., pp. 52–60.)

**810**

which was confusing and incorrect while leaving unchanged the State's ultimate burden of proof." (Ans., p. 31.) None of these arguments accurately present the correct standard of review for the retroactive application of judicial, as opposed to legislative, action.

■ The express prohibitions of the Ex Post Facto Clause apply to legislative action. In *Frank v. Mangum*, the Supreme Court held that "the constitutional prohibition: 'No state shall ... pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts,' as its terms indicate, is directed against legislative action only, and does not reach erroneous or inconsistent decisions by the courts." 237 U.S. 309, 344, 35 S.Ct. 582, 594, 59 L.Ed. 969 (1915). In borrowing principles from the Ex Post Facto Clause to hold that the Due Process Clause of the Fourteenth Amendment prohibits the "unforeseeable judicial enlargement of a criminal statute, applied retroactively," the Supreme Court in *Bouie v. City of Columbia*, 378 U.S. 347, 353–54, 84 S.Ct. 1697, 1702–03, 12 L.Ed.2d 894 (1964), stated

> An ex post facto law has been defined by this Court as one 'that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action,' or 'that aggravates a crime, or makes it greater than it was, when committed.' *Calder v. Bull*, 3 Dall. 386, 390, 1 L.Ed. 648. If a state legislature is barred by the Ex Post Facto Clause from passing such a

law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction. *Cf. Smith v. Cahoon*, 283 U.S. 553, 565, 51 S.Ct. 582, 586, 75 L.Ed. 1264 (1931). The fundamental principle that 'the required criminal law must have existed when the conduct in issue occurred,' Hall, General Principles of Criminal Law (2d ed.1960), at 58—59, must apply to bar retroactive criminal prohibitions emanating from courts as well as from legislatures. If a judicial construction of a criminal statute is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue,' it must not be given retroactive effect. Id., at 61.

(Footnote omitted.) This case recognized that the Due Process Clause prohibited courts from interpreting criminal statutes in such a way that they fail to give "fair warning" of the conduct that the statute makes a crime. *Id.* at 350–51, 84 S.Ct. 1697. In doing so, the Supreme Court incorporated into the protections of the Due Process Clause three of the four *Calder* categories of prohibited ex post facto laws.[48]

In *Calder*, Justice Chase stated that "[t]he prohibition, 'that no state shall pass any ex post facto law,' necessarily requires some explanation; for, naked and without explanation, it is unintelligible, and means nothing." *Calder*, 3 U.S. at 390. After noting the English common law usage that

---

**48.** Similarly, the Supreme Court in *Marks v. U.S.*, 430 U.S. 188, 192, 97 S.Ct. 990, 992–93, 51 L.Ed.2d 260 (1977), stated,

> The Ex Post Facto Clause is a limitation upon the powers of the Legislature, *see Calder v. Bull*, 3 Dall. 386, 1 L.Ed. 648 (1798), and does not of its own force apply to the Judicial Branch of government. *Frank v. Mangum*, 237 U.S. 309, 344, 35 S.Ct. 582, 593, 59 L.Ed. 969 (1915). But the principle on which the Clause is based

the notion that persons have a right to fair warning of that conduct which will give rise to criminal penalties is fundamental to our concept of constitutional liberty. *See United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989 (1954); *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939). As such, that right is protected against judicial action by the Due Process Clause of the Fifth Amendment.

had become known to the Framers of the Constitution, Justice Chase cataloged the types of criminal laws to which the prohibition applies:

I will state *what laws* I consider *ex post facto laws,* within the *words* and the *intent* of the prohibition. 1st. Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action.2d. Every law that *aggravates* a *crime,* or makes it *greater* than it was, when committed.3d. Every law that *changes the punishment,* and inflicts a *greater punishment,* than the law annexed to the crime, when committed. 4th. Every law that alters the *legal* rules of *evidence,* and receives less, or different, testimony, than the law required at the time of the commission of the offence, *in order to convict the offender.*

*Id.* (Emphasis in original.) It is this fourth category of laws that is at issue.

The Fifth Circuit Court of Appeals has recently announced a decision that is dispositive. In *Janecka v. Cockrell,* 301 F.3d 316, 322 (5th Cir.2002), the petitioner (Janecka) complained of the retroactive application by the Texas Court of Criminal Appeals of a certain "voucher" rule requiring that the prosecution disprove the exculpatory portions of any "confession" that it introduced into evidence. The Court of Appeals noted that Janecka's claim assumed "that the Supreme Court had incorporated wholesale *Calder*'s four categories into due process limitations on the retroactive application of judicial decisions." *Id.* at 323. In holding that the Supreme Court had not so incorporated *Calder*'s fourth category into the due process limitation applicable to a case in the same time period as the instant case, the Court of Appeals stated

At the time of the TCCA's 1996 decision in Janecka's case, the Supreme Court had not yet addressed the question of whether the limitation stated in *Calder*'s fourth category extended to the judiciary. The Supreme Court had, however, recently issued a decision that called into question the viability of the fourth category of Calder, even as applied to the legislature. In 1990, the Supreme Court had applied an alternative definition of ex post facto laws in *Collins v. Youngblood* that omitted *Calder*'s fourth category. 497 U.S. 37, 42–43, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990). [footnote omitted] In doing so, the Court suggested that the omission of *Calder*'s fourth category from the definition of ex post facto laws was more "faithful to our best knowledge of the original understanding of the Ex Post Facto Clause." *Id.* at 43, 110 S.Ct. 2715, 111 L.Ed.2d 30. According to the Court in *Youngblood,* not all laws that "alter [ ] the situation of a party to his disadvantage" or "deprive him of a substantial right involved in his liberty" violate the Ex Post Facto Clause. *Id.* at 47–52, 110 S.Ct. 2715, 111 L.Ed.2d 30. In light of *Youngblood* and the absence of any Supreme Court cases extending the limitation stated in *Calder*'s fourth category to the judiciary, we conclude that the TCCA's 1996 decision was not "contrary to" clearly established federal law as it existed at that time. *See Proctor v. Cockrell,* 283 F.3d 726, 735 (5th Cir. 2002). (holding on materially indistinguishable facts that TCCA's denial of petitioner's due process claim was not contrary to Supreme Court precedent as it existed in 1998). [footnote omitted]

Anticipating this argument, Janecka relies principally on the Supreme Court's recent decision in *Carmell v. Texas* as evidence of the continued viability of *Calder*'s fourth category, even after *Youngblood. Carmell v. Texas,* 529 U.S. 513, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000). In *Carmell,* the

Supreme Court invalidated the TCCA's retroactive application of a new statute that changed the amount of testimony required to convict a sex offender, in some cases requiring less corroborating evidence than previously needed for conviction. *Id.* at 516–20, 120 S.Ct. 1620, 146 L.Ed.2d 577. Because the new statute altered the rules of evidence and required less or different testimony than the law required at the time the offense was committed, the Court held that the new statute constituted an impermissible ex post facto law under *Calder*'s fourth category. *Id.* at 552–53, 120 S.Ct. 1620, 146 L.Ed.2d 577. Janecka argues that *Carmell* confirms the fact that *Calder* continues to restrict the ex post facto lawmaking of both legislatures and the judiciary.

Janecka's reliance on *Carmell* is misplaced. To begin, *Carmell* was decided in 2000, well after the TCCA's 1996 opinion denying Janecka's due process claim. Thus, Janecka cannot rely on it as stating clearly established federal law *at the time the TCCA ruled on his due process claim. See Proctor,* 283 F.3d at 734–35 (stating that because "*Carmell* was decided *after* the TCCA rendered its decision in this case . . . [it could] not properly be considered a part of 'clearly established' Supreme Court law at the time of the TCCA's decision"). Moreover, even if *Carmell* reaffirms the limitation placed on legislatures by *Calder*'s fourth category, it does not suggest that the Due Process Clause creates an identical limitation on the decisionmaking power of the judiciary.

In the alternative, Janecka argues that the TCCA's decision constituted an unreasonable application of clearly established federal law. Specifically, he argues that even assuming the TCCA applied the correct "fair warning" standard to his claim, the retroactive abrogation of *Palafox [v. Texas,* 608 S.W.2d

177 (Tex.Crim.App.1979)] still violated the Due Process Clause because it was an "unexpected and indefensible" change in the law. *See Rogers,* 532 U.S. at 461, 121 S.Ct. 1693, 149 L.Ed.2d 697 (stating that judicial alterations to common law doctrines of criminal law implicate the Due Process Clause "where [the alteration] is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue' "). Because we believe the TCCA's assessment of this claim was correct, as well as reasonable, Janecka's argument is without merit. First, we note that the abrogation of the *Palafox* rule did not criminalize conduct that was previously lawful. Rather, the TCCA's abrogation of the rule simply relieved the State of its burden to produce evidence to refute exculpatory matter contained in a confession admitted, and hence "vouched for," by the State. Second, we believe the abrogation of the *Palafox* rule was not altogether unexpected. At the time of its abrogation, the *Palafox* and other voucher rules had long been criticized by courts and scholars as "archaic, irrational, and potentially destructive to the truth-gathering process." *Chambers v. Mississippi,* 410 U.S. 284, 296 n. 8, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)(criticizing Mississippi's version of the voucher rule); Fed.R.Evid. 607 (rejecting the voucher rule); *see also Ibanez v. State,* 749 S.W.2d 804, 806–07 n. 3 (Tex.Crim. App.1986) (noting criticism of Texas's *Palafox* rule).

*Id.* at 323–25. (Footnotes omitted.)

For the same reasons, the fourth *Calder* category does not apply to Petitioner's claim as well. This alone is enough to require that Reed's ninth claim be denied. But even if such fourth category were to apply, this claim must still be denied because the change in Texas law would not violate the fourth *Calder* category even in such event.

On state habeas review, the trial court found that the differing instructions were indeed the result of a change in the law, but that such change did not reduce the prosecution's burden of proof.[49] (SHR, p, 704.) Instead, the change in the law merely reaffirmed the single standard of proof by eliminating a "valueless" extra instruction that "invite[d] confusion." *Id.* This interpretation is consistent with this Court's own reading of Texas law.

■ In arguing that *Hankins* relieved the prosecution of a higher burden, Reed quoted the following language from the opinion of the Texas Court of Criminal Appeals: "To require the charge on circumstantial evidence disregards this principle [circumstantial and direct evidence are equally probative as abstract proposition] by erroneously suggesting 'that proof of circumstantial evidence is subject to a more rigorous standard than is proof by direct testimonial evidence.'" (Am. Pet. p. 65, quoting from *Hankins*, 646 S.W.2d at 198, which quoted *State v. LeClair*, 425 A.2d 182, 184 (Maine 1981)).[50] Reed appears to argue that the burden of proof was relieved because language "erroneously suggesting" a more rigorous standard has now been eliminated. This Court believes that Reed has drawn the wrong connotation from the quoted opinions. Indeed, *Hankins* quoted from the Supreme Court's opinion in *Holland v. U.S.*, 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954), to show that since the standard is no different for circumstantial evidence as testimonial evidence, such a special instruction would not reflect the proper standard, but would instead be "confusing and incorrect." 646 S.W.2d at 197, 199 n. 1. A criminal defendant has no right "to a

---

**49.** The trial court on habeas review found, in part, as follows:

> 144. The Court concludes that applicant's suggestion that the elimination of the circumstantial evidence instruction somehow reduced the State's burden of proof misunderstands the Court of Criminal Appeals' holding in *Hankins*. *Hankins* merely reaffirmed the principle that there is but one standard of proof for criminal convictions. The constitutionally required burden of proof in a criminal case is that the State establish all the elements of an offense beyond a reasonable doubt. The instruction on circumstantial evidence was merely a means for the jury to apply the ultimate burden of proof. Thus, the State's ultimate burden of proof was the same with or without an additional instruction on circumstantial evidence. Recognizing this fact, the Court of Criminal Appeals re-examined the value of the separate instruction and concluded that when the jury is properly instructed on the State's ultimate burden, a charge on circumstantial evidence is valueless and invites confusion. *Hankins v. State*, 646 S.W.2d at 199.

(SHR, p. 704.)

**50.** The fact that Reed quotes this language out of context is shown both by the *Hankins* opinion and by the opinion that it quoted. A fuller quote from the opinion of the Supreme Judicial Court of Maine in *LeClair*, shows that the standard of proof was never intended to be any different, but was merely expressed in a confusing way. In *LeClair*, the Maine court stated that the same language as that sought be Reed

> has been disapproved as a jury instruction, because courts have found that it tends to confuse the jury by creating an *erroneous* distinction between direct and circumstantial evidence. The now discredited instruction was *never intended* to create a special rule concerning sufficiency of the evidence in circumstantial evidence cases. It was designed only as a "precautionary additional clarification" of the meaning of proof beyond a reasonable doubt. *State v. Pike*, Me., 306 A.2d 145, 149–50 (1973). Our more recent decisions make clear that the "negative exclusion" instruction is unacceptable and valueless because it *wrongly* suggests that proof of circumstantial evidence is subject to a more rigorous standard than is proof by direct testimonial evidence. *State v. Little*, Me. 343 A.2d 180, 185 (1975); *State v. Heald*, Me., 333 A.2d 696, 700 (1975).

(Emphasis added.)

charge which is incorrect, confusing, or misleading." *U.S. v. Harrelson*, 705 F.2d 733, 737 (5th Cir.1983). Since the standard has not changed, but the language has simply been clarified to remove confusion, no ex post facto problem would exist, even if such judicial action came under *Calder*'s fourth category of prohibited laws. Therefore, Petitioner's ninth claim should be denied.

## E. Refusal to apply intervening decision retroactively.

In his tenth claim for relief, Petitioner complains that his rights to due process and equal protection of the laws guaranteed by the Fourteenth Amendment have been violated by the refusal of the state appellate court to apply a state court decision retroactively to his case. At his trial, Reed objected to the failure of the trial court to include a suggested definition of reasonable doubt in the jury instructions.[51] At the time of such objection, no definition of reasonable doubt was required in the state courts of Texas.[52] However, between 1991 and 2000, the Texas Court of Criminal Appeals mandated such an instruction under state law.[53] Petitioner correctly acknowledges in his Amended Petition "that the Court of Appeals for the Fifth Circuit has substantially rejected these argu-

---

51. At the trial, Reed's objections to the jury instructions included the following:

Number 7. We object to the failure of the charge to include a definition of "reasonable doubt". I believe the Court should instruct the Jury as to the proper definition of "reasonable doubt" and proper standard that they should use in determining guilt beyond a reasonable doubt. We would submit to the Court that the definition out of the Federal practice instructions of [Devitt] and Blackmar in the Supreme Court case of [*Holland*] and we submit the following definition[:] The kind of doubt that would make a reasonable person hesitate to act in the conduct of their more serious and important personal affairs. That is the definition that's used in all of the Federal Courts, and I believe that's the proper standard to apply, and we object to the Court failing to include that definition in the charge. (SOF XXII, 9–137.)

52. During the trial court's exchange with the attorneys regarding this objection, the trial judge made reference to a perceived new movement in the law regarding reasonable doubt instructions. But the trial judge's reference is not clear and was apparently not considered persuasive to change existing state law requirements. (SOF XXII, p. 9–139.)

53. In 1991, the Texas Court of Criminal Appeals mandated that criminal jury instructions contain a definition of reasonable doubt, as follows:

All persons are presumed to be innocent and no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt. The fact that a person has been arrested, confined, or indicted for, or otherwise charged with, the offense gives rise to no inference of guilt at his trial. The law does not require a defendant to prove his innocence or produce any evidence at all. The presumption of innocence alone is sufficient to acquit the defendant, unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt after careful and impartial consideration of all the evidence in the case.

The prosecution has the burden of proving the defendant guilty and it must do so by proving each and every element of the offense charged beyond a reasonable doubt and if it fails to do so, you must acquit the defendant.

It is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecution's proof excludes all "reasonable doubt" concerning the defendant's guilt.

A "reasonable doubt" is a doubt based on reason and common sense after a careful and impartial consideration of all the evidence in the case. *It is the kind of doubt that would make a reasonable person hesitate to act in the most important of his own affairs.* Proof beyond a reasonable doubt, therefore, must be proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs.

ments." (Am. Pet., p. 67 n. 27)(citing *Earhart v. Johnson*, 132 F.3d 1062, 1068 (5th Cir.1998) and *Lackey v. Scott*, 28 F.3d 486 (5th Cir.1994)). This Court is bound by Circuit precedent and must deny such claim. Accordingly, Petitioner's tenth claim for relief should be denied.

### F. Appellate delay.

█ In his eleventh claim for relief, Petitioner contends that his rights to due process of law guaranteed by the Fourteenth Amendment and to a speedy trial as guaranteed by the Sixth Amendment were violated by the state appellate court's delay in resolving his direct appeal. (Am. Pet., pp. 71–85.) He presented this complaint to state courts in his postconviction application for writ of habeas corpus. (SHR, pp. 94–108.) The trial court on habeas review entered extensive findings and conclusions on this point, including specifically that Reed "received meaningful appellate review of all of his claims" in his direct appeal, and that the time taken by the state appellate court "was not extreme or excessive," but that it "served to benefit" Reed, particularly as it related to his complaints regarding the prosecutor's use of peremptory challenges under *Batson v. Kentucky*. (SHR, pp, 708–22.)

Reed has not shown how the state court's adjudication of this claim could have "resulted in a decision that was contrary to, or involved an unreasonable ap-

plication of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). Reed has not directed this Court to any Supreme Court precedent specifically authorizing federal habeas corpus relief under 28 U.S.C. § 2254 due to an inordinate delay in the state appellate process, and this Court's research has not uncovered any such precedent. Instead, this claim appears to rely entirely upon unsettled principles which are in conflict and still developing in the different Circuit Courts of Appeal.[54] Therefore, it does not appear that such claim could form the basis of relief for any claim adjudicated on the merits in state court under 28 U.S.C. § 2254(d)(1). *But see Mims v. LeBlanc*, 176 F.3d 280 (5th Cir.1999)(affirming denial of habeas relief for state prisoner during pendency of his state appeal, while implying that relief would be available in appropriate case without mentioning 28 U.S.C. § 2254).

In fact, the trial court utilized the same cases and factors in its reasoning as those suggested by Reed. In accordance with current Fifth Circuit precedent, the state court analyzed this claim using the four factors expressed in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972), for determining a speedy trial violation resulting from a pretrial delay.[55] *See Mims*, 176 F.3d at 282–83; *Rheuark v. Shaw*, 628 F.2d 297, 303 (5th Cir.1980). Therefore, Reed will not

---

In the event you have a reasonable doubt as to the defendant's guilt after considering all the evidence before you, and these instructions, you will acquit him and say by your verdict "Not guilty".

(Emphasis added.) *Geesa v. State*, 820 S.W.2d 154, 162 (Tex.Crim.App.1991)(citing E. Devitt Y C. Blackmar, Federal Jury Practice and Instructions, § 11.14). This requirement has subsequently been eliminated. *Paulson v. State*, 28 S.W.3d 570, 571, 573 (Tex.Crim.App.2000).

**54.** Reed cites the following cases in support of his argument: *Simmons v. Beyer*, 44 F.3d

1160 (3rd Cir.1995); *Harris v. Champion*, 15 F.3d 1538, 1558 (10th Cir.1994); *U.S. v. Tucker*, 8 F.3d 673, 676 (1993)(en banc); *Cody v. Henderson*, 936 F.2d 715, 719 (2nd Cir.1991); *U.S. v. Johnson*, 732 F.2d 379, 381 (4th Cir.1984); *U.S. v. Pratt*, 645 F.2d 89, 91 (1st Cir.1981); and *Rheuark v. Shaw*, 628 F.2d 297, 302 (5th Cir.1980).

**55.** These factors are "[l]ength of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Barker*, 407 U.S. at 530, 92 S.Ct. 2182; *Rheuark*, 628 F.2d at 303 n. 8.

be entitled to relief on this claim unless he can demonstrate that the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d)(2).

 Applying the same four factors, this Court comes to the same result as did the trial court on state habeas review. Although Reed's direct appeal did indeed proceed extraordinarily slowly, it did not result in a denial of his right to due process. The conviction and death sentence at issue were signed on March 23, 1983.[56] *State v. Reed,* Cause No. F81–1988–PL (Crim. Dist. Ct. No. 5, Dallas County, Tex.). On August 11, 1983, Reed filed a motion for new trial in the trial court, (Tr., pp. 71–76), which was overruled on October 21, 1983. *State v. Reed,* Cause No. F81–1988–PL (Crim. Dist. Ct. No. 5, Dallas County, Tex.); (Tr., p. 97). On January 20, 1984, the trial court made a certificate in connection with the appeal and directed the clerk to process the necessary records so that the appeal would not be frustrated. *State v. Reed,* Cause No. F81–1988–PL (Crim. Dist. Ct. No. 5, Dallas County, Tex.); (Tr., p. 98). On January 25, the trial court clerk certified the record and sent a notice that such record was ready for the parties to inspect. (Tr., p. 99–100.) On Febraury 9, 1984, Reed filed his objections to the record. (Tr., pp. 101–02.) On March 21, 1984, the trial court clerk again certified the record for appeal and gave notice to the parties that it was ready to be inspected. (Tr., pp. 318–19.)

On May 22, 1984, the trial court entered its order approving the record on appeal, consisting of 25 volumes of the Statement of Facts and 1 volume of the Transcript. *State v. Reed,* Cause No. F81–1988–PL (Crim. Dist. Ct. No. 5, Dallas County, Tex.); (Tr., p. 320.) Reed's 107–page Appellant's Brief, raising 54 grounds of error, was tendered to the appellate court on March 20, 1985.[57] Appellee's 251–page reply brief was filed on January 15, 1986.[58]

The appeal was submitted upon oral argument on April 23, 1986. A week later, the Supreme Court announced its ruling in *Batson v. Kentucky,* which dramatically changed the law in support of appeal points argued by Reed. But Reed, a white male, would not have received the benefit of this change in the law if his appeal had been resolved before 1991. *See Powers,* 499 U.S. at 415, 111 S.Ct. at 1373 (extending *Batson* in 1991 to allow standing to defendants to complain of prosecutor's improper use of peremptory strike to exclude member of different race than defendant); *See also Seubert v. State,* 787 S.W.2d 68 (Tex.Crim.App.1990)(pre-*Powers* Texas case holding that white male defendant had no Sixth Amendment right to raise *Batson* complaint of prosecution's use of peremptory challenges to exclude African–American venirepersons); *Wiese v. State,* 811 S.W.2d 958, 959 (Tex.App.-Fort Worth, 1991, pet. ref'd)(reversing trial court due to intervening decision in *Powers* that changed application of *Batson* in Texas).

Unlike the trial court, this Court would conclude that the appeal delay was excessive.[59] Therefore, Reed has satisfied the

---

**56.** This was the second conviction and death sentence. *See supra,* n. 1.

**57.** This is the date shown in the certificate of service by Reed's attorneys for the date that Reed's Appellant's Brief was served on the District Attorney's office, as shown in the copy filed among the records in this cause. (Appellant's Brief, p. 107.)

**58.** As shown by the file mark on the copy of the brief filed among the records of this cause.

**59.** The trial court found that "any delay in handing down the opinion in applicant's case was not excessive." (SHR, p. 713.) Although, this Court agrees with many of the reasons that the trial court expressed for this

first of these four factors. But this is the only factor that is satisfied. The reason for the delay is not entirely clear, but it was not attributable to the prosecution.[60] This illuminates an important distinction between appeal delays and pretrial delays for the purposes of this analysis.

It is the interests of the prosecution, and its victim, that are punished when relief is granted for violating speedy trial rights. In failing to carry its burden of prosecution to promptly bring an accused to trial, the prosecution has committed a wrong justifying such punishment. However, once the trial is completed and the judgment and sentence are pronounced, it is the defendant that carries the burden of prosecuting his appeal if he chooses to do so. Any delay in the consideration of such appeal is not ordinarily attributable to agents of the prosecution, and therefore does not carry the same justification for punishing such interests. This respect for separation of powers is further enhanced by the interests of federalism in cases brought under 28 U.S.C. § 2254. These distinctions require more caution in considering the relief requested in this claim.

The next factor is also against Reed. He never made any complaint about this appeal delay until his postconviction application for writ of habeas corpus, filed several months after his direct appeal had become final. (*See* SHR, pp. 713–14.) However, this is most likely due to the nature of this case, which bears another important distinction. In this case, the defendant is under a sentence of death. Unlike any sentence for a term of years that begins immediately and may be shortened by the earlier conclusion of an appeal, the ultimate sentence in a capital case such as this is not imposed until the appeal process has been completed. Delays in the imposition of the death sentence are normally welcomed by the prisoner but not by the prosecution or the victim's family. Therefore, not surprisingly, Reed did not complain during his appeal of this delay.

Finally, the delays have not been shown to have prejudiced Reed. Again, the trial court found not only that Reed's claims of prejudice were without merit, but that the delays actually benefitted him, especially in allowing the consideration of *Batson* claims that would not otherwise have existed if the appeal had been resolved more timely.[61] None of these findings are objec-

---

conclusion, the delay appears clearly excessive even under those circumstances.

**60.** Reed claims that it is "attributable almost exclusively to delay occurring in the Court of Criminal Appeals." (Am.Pet., pp. 74–75.) The trial court pointed to other factors, such as the fact that this was a death penalty case, the length and complexity of the case, and the intervening uncertainty of case law involving his *Batson* claim. (SHR, 711–13.)

**61.** The trial court analyzed Reed's allegations "that the Court of Criminal Appeals' delay in adjudicating his direct appeal has substantially prejudiced him in six specific ways: (1) the lengthy delay in processing his direct appeal has now rendered the jury's affirmative answer to the second special issue concerning future dangerousness unreliable; (2) the delay resulted in the Court failing to properly consider his sufficiency claim left unresolved from the appeal of his first conviction; (3) the

delay prejudiced the Court's disposition of applicant's *Batson* claims; (4) the delay has prevented the Court's consideration of newly discovered evidence of perjury committed at applicant's retrial; (5) the delay resulted in applicant's loss of favorable reliance on intervening case law regarding *Geesa* error; and (6) the delay resulted in an inconsistent application of the law relating to an improper comment by prosecutor." (SHR, pp. 714–15.) Each of these findings was resolved in a reasonable manner. In response to item (1), the jury's answer was based on the evidence and not "rendered unreliable" by the number of years he spends on death row. (SHR, pp. 715–16.) In response to (2), the trial court concluded that Reed's jeopardy claims were meritless. (SHR, pp. 716–18.) In addition, this Court notes that the new trial may have been based on new evidence and not upon any deficiency in the evidence adduced at trial. *See supra*, n. 1. In response to (3), the

tively unreasonable determinations of fact, and are entitled to deference in this Court. Accordingly, the balance of these factors weigh against Reed's claimed due process violation. Petitioner's eleventh claim for relief should be denied.

### G. Cruel and Unusual delay.

In his twelfth claim for relief, Petitioner contends that his rights to be free from cruel and unusual punishment guaranteed by the Eighth Amendment was violated by the inordinate delay in carrying out his death sentence. (Am.Pet., pp. 85–105.) However, such a delay has been held in this Circuit to not offend the constitution. See Carter v. Johnson, 131 F.3d 452, 466 n. 24 (5th Cir.1997); Lackey v. Johnson, 83 F.3d 116, 117 (5th Cir.1996); White v. Johnson, 79 F.3d 432, 437–40 (5th Cir. 1996). Further, to do so would violate the non-retroactivity doctrine as incorporated into the AEDPA. See 28 U.S.C. § 2254(d)(1); Teague v. Lane, 489 U.S. 288, 310, 109 S.Ct. 1060, 1075, 103 L.Ed.2d 334 (1989). Therefore, Petitioner's twelfth claim for relief should be denied.

### H. Failure to instruct on lesser included offense.

In his thirteenth and final claim, Petitioner contends that the trial court violated his rights under the Eighth and Fourteenth Amendments when it refused to instruct on the lesser-included offense of murder. In support of this claim, he cites Beck v. Alabama, 447 U.S. 625, 638, 100 S.Ct. 2382, 2390, 65 L.Ed.2d 392 (1980), which "stands for the proposition that 'the jury [in a capital case] must be permitted to consider a verdict of guilty of a noncapital offense 'in every case' in which 'the evidence would have supported such a verdict.'" Cordova v. Lynaugh, 838 F.2d 764, 767 (5th Cir.1988)(quoting Hopper v. Evans, 456 U.S. 605, 610, 102 S.Ct. 2049, 2052, 72 L.Ed.2d 367 (1982)). In Cordova, the Court of Appeals went on to recognize that

> Although Beck, strictly speaking, 'holds only that a state cannot impose a blanket ban on the giving of lesser-included-offense instructions in a capital case,' Reddix v. Thigpen, 805 F.2d 506, 511 (5th Cir.1986), we have consistently held that Beck's holding applies when the state trial court refuses a lesser-included-offense instruction."

Id. The Court of Appeals then set forth the applicable standard,[62] which was reaffirmed in Jones v. Johnson, 171 F.3d 270, 274 (5th Cir.1999), as follows: "A capital defendant is constitutionally entitled to in-

---

trial court discussed a number of developments during the pendency of Reed's appeal, and concluded that the delay actually operated to benefit Reed. This Court agrees. In response to (4), the trial court pointed to changes in the law benefitting Reed. In addition, this Court has allowed a further development of this claim and has found it entirely without merit. In response to (5), the trial court properly characterized the perceived prejudice as "nothing more than pure speculation." (SHR, p. 720.) And finally, in response to (6), the trial court characterized that as a mere assertion that the Court of Criminal Appeal wrongly decided his appellate complaint. That is also not prejudice resulting from such delay. These findings are not objectively unreasonable.

**62.** The Court of Appeals then concluded

> that the federal standard-a lesser included instruction must be given when a jury could rationally convict of the lesser offense and acquit on the greater offense-is equivalent to the Beck standard that a lesser included instruction must be given when the evidence would have supported such a verdict. In other words, due process and the Eighth Amendment require that, in a capital case, the jury must be allowed to consider a lesser included noncapital offense if the jury could rationally acquit on the capital crime and convict for the noncapital crime. Id.

structions on a lesser-included offense only if he has demonstrated that the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater."

This is similar to the standard applied in Texas state courts,[63] which the Texas Court of Criminal Appeals determined in his direct appeal that Reed failed to meet.[64] Before this Court, Reed emphasizes the mental element required and also argues that the circumstantial nature of much of the prosecution's case contains the same deficiency noted in *Cordova*. For the reasons set out below, both of these arguments fail.

■ The evidence of this case does not support a rational finding that Reed acted knowingly but not intentionally. The victim was found "lying naked in her back, legs spread apart, ... breasts exposed," "blood oozing from her mouth, gaze fixed and hands tied tightly behind her back with a telephone cord. Around her neck

were a plastic bag and belt pulled taut." *Reed*, slip op. at 1–4. At trial, her roommate testified that she observed the victim's purse on the sofa with many of its contents scattered about, and heard a male voice from behind a closed bedroom door say "Don't come in here. Stay out there." *Id.* She testified that Petitioner came out of the bedroom, said "Hi" and leaned through the doorway, snapping closed a knife sheath and making the excuse that "I'm with maintenance, I came to check and change the air conditioner filters," and pointed toward the bedroom ceiling. *Id.* Petitioner then grabbed her by the throat with both hands and threw her to the living room floor on her stomach, saying, "Don't move or I'll break your [expletive deleted] neck." *Id.* He gagged her with a Braniff uniform sash, tied her hands with a leather belt, and covered her head with an apron. She then heard him sit down in the bedroom and ask, "Do you have any money?" Petitioner searched through the contents of both purses, eventually stran-

---

**63.** In *Cordova*, the Court of Appeals was careful to not denigrate "any state's standard, including Texas'," 838 F.2d at 767, and noted this in its discussion of the Texas standard:

> As explained in *Cordova [v. State]*, 698 S.W.2d [107] 113 [(Tex.Crim.App.1985)], Texas courts apply a two prong test for lesser included offenses. The first prong, 'that the lesser included offense must be included within the proof necessary to establish the offense charged,' is, apparently, nothing more than a requirement that the lesser included offense really be a lesser included offense. The second prong that "there must be some evidence in the record that if the defendant is guilty, he is guilty of only the lesser offense," seems very similar to the federal standard.
>
> However, we are not concerned about the Texas standard or its possible misapplication to the facts here. Instead, we only address the issue of whether due process required that Cordova's jury be given a lesser included instruction.

*Id.* at 767 n. 3.

**64.** In his direct appeal, the Texas Court of Criminal Appeals stated the applicable standard in Texas, and held that,

> Appellant failed to successfully meet this test. Appellant could not point to evidence tending to establish that he was guilty only of murder. In the instant case all appellant can do is point to McLean's testimony, which established that appellant possessed intent to commit both murder and the underlying offenses of aggravated rape and robbery, and allege that it was suspect. When appellant testified at the instant trial, he swore that he did not commit any of the actions that of which he was accused. There was no evidence admitted to prove either that appellant did not intend to commit the robbery and the aggravated rape, or to show that they did not occur. We find there was no evidence at trial that tended to establish appellant was guilty only of murder, so that a rational trier of fact could have reached that conclusion. [citations omitted] Appellant was not entitled to an instruction on murder.

*Reed v. State*, No. 69,292, slip op. at 68.

gling her. "When the pain became almost more than she could bear, Pursley feigned unconsciousness. The man released and briefly reapplied pressure. Removing the apron from her face, he threw it to the floor, circled the apartment once again and left." *Id.* This evidence does not suggest that Petitioner's conduct was merely knowing and not intentional.

Further, in light of the jury instructions, such claim must fail. As stated in *Jones v. Johnson*, the jury had the opportunity to distinguish between knowing and intentional conduct during the sentencing. The first punishment phase issue required the jury to find, beyond a reasonable doubt, that the conduct of the defendant that caused the death of the deceased was committed deliberately and with reasonable expectation that death would result. The judge defined "deliberate" as "something more than intentional" and as a "conscious decision [embracing] more than a will to engage in conduct." Any suggestion that the jury rationally could have found Jones guilty of killing knowingly but not intentionally is foreclosed by the affirmative response to the greater mental element during the sentencing phase.

171 F.3d at 275.

Regarding Petitioner's argument that his case contains the same defect as noted by the Court of Appeals in *Cordova*, the facts of this case are clearly distinguishable. Cordova observed Hernandez and a female companion named West as they "parked" in the early morning hours in a small parking lot in San Antonio. 838 F.2d at 765. Cordova returned with *three other men*, and upon knocking Hernandez unconscious with the tire iron, took West by the hand into the woods where she was sexually assaulted by Cordova and eventually also by two of the other men. *Id.* After Cordova struck Hernandez, Villanueva (one of the other men) killed and robbed Hernandez of his wallet, watch, and other items in his car. All of the stolen property was traced back to this accomplice, and none of it was found on Cordova or traced back to him. *Id.* at 766, 769. The Court of Appeals found that "the sequence of events tends to show that Cordova did not personally commit the robbery of Hernandez." *Id.* at 769. Instead, at the time that he struck Hernandez, "Cordova seemed more interested in raping" West. *Id.* at 770. Therefore, even though Cordova was guilty as a party to a felony murder or robbery of Hernandez, there was evidence suggesting that Cordova could be guilty of the murder of Hernandez, but not capital murder in the course of the robbery of Hernandez, because such evidence indicated "that his purpose throughout was to rape West, not to rob Hernandez." *Id.*

The issue in *Cordova* involved the application of Texas' law of parties in cases with multiple defendants. Clearly, this has little bearing on an offense committed by a single person. Petitioner's thirteenth and final claim for relief should be denied.

## IX. CONCLUSION.

For each of the reasons set out above, each of the claims for relief should be overruled and the petition for writ of habeas corpus should be, in all things, denied.

### RECOMMENDATION

Petitioner has failed to make a substantial showing of the denial of a federal right. The state court adjudication on the merits neither resulted in a decision that was contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding. Petitioner's petition for a writ of habeas corpus should be DENIED.

Oct. 16, 2002.